IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 22, 2008

Charles R. Fulbruge III
Clerk

No. 07-70040

ROBERT ALAN FRATTA

Petitioner - Appellee-Cross-Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION

Respondent - Appellant-Cross-Appellee

Appeals from the United States District Court
for the Southern District of Texas

Before KING, DAVIS, and CLEMENT, Circuit Judges.

KING, Circuit Judge:

In this petition for writ of habeas corpus, the district court conditionally granted relief to petitioner Robert Alan Fratta, a Texas death-row inmate. Fratta was convicted of capital murder and sentenced to death in Texas state court for arranging the murder-for-hire of his wife. The district court determined that Fratta's Confrontation Clause rights were violated by the admission into evidence at trial of certain out-of-court statements made by the two men who carried out the murder (who were tried separately and were unavailable for cross-examination). Respondent Nathaniel Quarterman now

appeals the district court's conditional grant of habeas relief. For the reasons that follow, we conclude that the district court was correct in concluding that Fratta is entitled to habeas relief based on the violations of the Confrontation Clause that occurred at his trial. Accordingly, we affirm the judgment of the district court. In addition, Fratta requests a certificate of appealability on other issues that the district court determined did not warrant habeas relief. This request is denied.

## I. BACKGROUND

The district court identified two sets of statements that were improperly admitted in violation of Fratta's Confrontation Clause rights at trial: (1) custodial confessions given to law enforcement officials by the two men who carried out the murder; and (2) additional statements concerning the murder made by one of the men to his girlfriend. On appeal, the State[1] does not challenge the district court's determination that Fratta's Confrontation Clause rights were violated by the admission of the custodial confessions at trial. Nor does the State argue that the district court was wrong in concluding that the error in admitting the custodial confessions, considered in conjunction with the statements made to the girlfriend, was harmful. Rather, the State's argument relates strictly to the district court's determination that the statements made to the girlfriend were admitted in violation of the Confrontation Clause. The State does not defend the rationale offered by the state court for admitting these statements. Instead, it argues that, though the state court may have applied federal law incorrectly in resolving Fratta's challenge to these statements, their admission nonetheless was consistent with the Confrontation Clause because

---

[1] As context indicates, we will use the term "State" to refer either to respondent Quarterman, who in his official capacity as Director, Texas Department of Criminal Justice—Correctional Institutions Division, was named as the respondent to Fratta's petition, or to the State of Texas, in whose name the Harris County District Attorney's office originally prosecuted Fratta in state court.

they possess sufficient indicia of reliability. Considering these statements admissible and considering the remaining admissible evidence at trial, then, the State argues that the error in admitting the custodial confessions was harmless.

Though the above provides an adequate bird's-eye view of the issues on this appeal, we note that things are slightly more complicated on the ground, due to the fact that this case has been and must be viewed through the prism of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Thus, we must determine whether the district court was correct in concluding that the state court's adjudication of Fratta's Confrontation Clause claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. We must also consider whether the district court was correct in concluding that the errors identified by the court were not harmless. Since the harmless error analysis will require an evaluation of the impact of the improperly admitted statements in determining the jury's verdict, the two sets of out-of-court statements at issue are set out in detail below in the context of the other evidence that was adduced by the State at trial. First, though, we provide a brief overview of the case and applicable Confrontation Clause law.

A.    Overview

Fratta was charged with the capital murder of his wife, Farah Fratta ("Farah"), under a theory of employing another to commit the murder for remuneration or the promise of remuneration. According to the State, the principals in the murder plot were Fratta, Joseph Prystash, and Howard Guidry. Fratta made the arrangements with Prystash, who in turn solicited Guidry to be the triggerman, with Prystash serving as the getaway driver. Prystash lived with his girlfriend, Mary Gipp, in the apartment next door to Guidry. Gipp, who also knew Fratta and Farah from the gym where she and Prystash worked out, had some knowledge of the plan to kill Farah but did nothing to stop it. Several months later, however, after Guidry was arrested for an unrelated bank robbery,

Gipp informed the police that Guidry had been involved in Farah's death. Prystash and Guidry ultimately gave custodial confessions in which they implicated themselves, each other, and Fratta in the murder plot. They were tried separately for capital murder, and each was convicted and sentenced to death.

Prystash and Guidry did not testify at Fratta's trial, but a sheriff's deputy, Sergeant Danny Ray Billingsley, selectively related the substance of their confessions to the jury. In eliciting portions of the custodial confessions from Sgt. Billingsley, the State took pains to avoid eliciting any statements from the confessions that incriminated Fratta by name; however, the confessions as related by Sgt. Billingsley made it quite clear that Prystash and Guidry had been engaged by someone to kill Farah for remuneration. Thus, for example, the State elicited testimony from Sgt. Billingsley to the effect that Prystash and Guidry expected to receive $1,000 and a Jeep as remuneration for the killing, but quite carefully did not inquire as to the source of that remuneration. Mary Gipp also testified at Fratta's trial, and related several statements that Prystash had made to her concerning the murder, both before and after it had been committed. It is these two sets of statements—the custodial confessions and Prystash's statements to Gipp—that formed the basis for the district court's grant of habeas relief.

Fratta's trial was conducted, and his direct appeal became final, before the Supreme Court issued its decision in Crawford v. Washington, 541 U.S. 36 (2004), which significantly changed Confrontation Clause doctrine. The Court has subsequently decided that the rule announced in Crawford is not retroactive to cases already final on direct review. See Whorton v. Bockting, 127 S. Ct. 1173, 1177 (2007). Since the judgment in Fratta's case was already final on direct review when Crawford's rule was announced, Fratta may not rely on Crawford in this habeas proceeding and must depend solely on the pre-Crawford law that

governed when his direct appeal became final. See id. at 1180. This law "held that the Confrontation Clause permitted the admission of a hearsay statement made by a declarant who was unavailable to testify if the statement bore sufficient indicia of reliability, either because the statement fell within a firmly rooted hearsay exception or because there were 'particularized guarantees of trustworthiness' relating to the statement in question." Id. at 1178 (quoting Ohio v. Roberts, 448 U.S. 56, 66 (1980)).

B.     The Evidence Adduced at Trial

1.     The Divorce Proceedings

Fratta and Farah were married in 1983 and had three children. Fratta was employed by Missouri City, Texas, as a public safety officer.[2] The Frattas' marriage experienced difficulties, and Farah filed for divorce in March 1992. In the course of the divorce proceedings, Farah described in a deposition how Fratta's bizarre and deviant sexual demands caused her to seek the divorce.[3] Fratta and Farah underwent psychological evaluations for the purpose of determining which parent should be named managing conservator of the children, in anticipation of a trial on the issue of child custody. A trial date was set in family court for November 28, 1994.

A number of witnesses testified that as the divorce proceedings progressed and the custody trial neared, Fratta made no secret of his bitter feelings toward Farah and often expressed a desire to see her dead. One of Fratta's acquaintances from the gym, for example, testified that after one fight with Farah, Fratta "made a statement about using a 9 mm" and "putting some slugs

---

[2] Public safety officers in Missouri City are cross-trained as police officers and firefighters.

[3] Several other witnesses at trial—including a Harris County domestic services investigator, a psychologist, a friend of Farah's, and friends and acquaintances of Fratta's—gave similar testimony regarding Fratta's unusual sexual proclivities.

into Farah." To another acquaintance, Fratta talked of shooting Farah in the head. One of Fratta's co-workers, a fellow Missouri City public safety officer, testified that rather than pay child support to Farah, Fratta said "he would kill her and he would be out in five years and get his kids back, but that he wouldn't pay her." Similarly, another Missouri City public safety officer recalled a conversation in which Fratta was "upset about his child custody payments" and stated that, "I just ought, I'll kill her, and I'll do my time and when I get out, I'll have my kids." Fratta also discussed killing Farah with James Podhorsky, a friend from the gym who sometimes went out with Fratta to topless clubs. Podhorsky testified that:

> [Fratta] said that, when we would go out he would take his gun with him. And I didn't think it was a real good idea a police officer or not we should have a gun in the car if we were going to go out drinking in clubs and his response was well, the reason I'm bringing the gun is in case we run into Farah, I'll shoot her myself and make it look like a car jacking.

Fratta also asked several people if they, or anyone they knew, would kill Farah. One woman that Fratta met in a diner testified that Fratta asked her if she knew someone who would kill his wife or "hurt her a little bit." Another woman who met Fratta through a phone dating service similarly recalled that Fratta asked her if she knew anyone who could kill his wife, specifically any "black people." Three months before Farah's murder, Fratta told an acquaintance at the gym that "he would be better off if she was dead," and then asked the acquaintance if he knew someone who could "knock her off." A co-worker testified that when he mentioned his own ex-wife to Fratta, Fratta commented that it would "solve both our problems if [the co-worker] would kill [Fratta's] wife, [Fratta] would kill [the co-worker's]." Fratta also told an acquaintance at the gym that he "needed to get someone to take care of Farah,"

and explained that he "had seen this happen before several times and that people had gotten off and . . . that most of them . . . went unsolved."

Many of the witnesses who heard Fratta talking about killing Farah or arranging for her to be killed testified that they did not think that Fratta was serious, and that they thought he was only joking, or that the talk was just his way of venting or blowing off steam during a bitter divorce. But at least one of these individuals came to believe that Fratta was serious. James Podhorsky, like the others, at first "laughed it off" and "really didn't take it seriously" when Fratta asked if he knew anybody who would kill Farah. Later, though, Podhorsky "knew that [Fratta] was serious" after Fratta mentioned specific sums of money, explained the method of payment he would use (an upfront payment with the rest to come from Farah's life insurance policy or an overseas account that held a legal settlement), and displayed a schedule of Farah's daily activities that he had apparently compiled to aid the killer. At one point Fratta tried to get Podhorsky, whom he knew to be having financial difficulties, to kill Farah himself. Podhorsky declined, saying, "I might need money, I mean bad, but not that bad." Fratta also explained to Podhorsky that the reason he talked so openly about having Farah killed was "so the day that it happens the police wouldn't know where to start [or] how to conduct their investigation. [They] would have so many leads."

2.     The Crime and its Aftermath

On the night of November 9, 1994, a Wednesday, Fratta ate dinner with his and Farah's three children at Wyatt's Cafeteria and then took the children to a Catholic church in Humble. He left his two youngest children at the church nursery and delivered his oldest to a catechism class. Meanwhile, Fratta attended a meeting in the church for parents whose children were preparing for first communion. One witness testified that Fratta was acting "real tense" when he dropped his children off at the nursery. Others described Fratta's behavior

during the parents' meeting: he repeatedly left the meeting to go to the parish office, where he made several phone calls and answered the phone twice.

Farah had her hair cut on that same night, and left the salon around 7:45 or 7:50. She returned home and pulled into her driveway around 8:00. At that time, Farah's across-the-street neighbors were sitting in their living room, which had a view of Farah's house and garage. One neighbor testified that she heard a shot, looked out the window into Farah's garage, heard a scream, saw Farah fall to the ground beside her car, and then heard another shot. About three minutes later, the neighbor saw a person standing on the side of Farah's house. The neighbor testified that this person was "in black and . . . either a black man or he was white and had black makeup on or something and he wasn't very tall and he had a very round head." Another neighbor testified that he saw a man "dressed in all black or all dark colors and if it was a white man with white skin, it was light enough I could reflect that it was a white person, so I immediately expected it was either a white person with a stocking over it or it was a black person." A few minutes later, a silver or gray car with a burned-out headlight drove up, picked up the man, and quickly drove off. The neighbors called 911, and Farah was taken to Hermann Hospital, where she was pronounced dead in the emergency room. One of the first law enforcement officials on the scene noticed that Farah's purse was undisturbed.

Various individuals found Fratta's demeanor on the night of Farah's murder to be odd. Fratta arrived at Farah's house thirty to forty minutes after the police and told one officer that "he was in a hurry and . . . wanted to expedite the matter" since he had his children with him. This officer testified that Fratta showed no signs of sadness, concern, or surprise. An X-ray technologist at Hermann Hospital who talked to Fratta on the phone that night testified that he was "very matter of fact . . . cut and dry," and "very blase." A detective who observed Fratta at the scene testified that Fratta did not appear to be

emotionally upset but "seemed very confident, very composed," and "well in command of the situation." Later that night, this detective interviewed Fratta at the homicide division office, where he felt that Fratta was being deceptive. Fratta consented to a search of his car, where police found a 9 mm pistol and $1,050 in cash in a plain white envelope. The police also found Fratta's personal address book and a diary in the trunk of his car.

Fratta stayed at the homicide division office for at least fourteen hours and was interviewed by several officers on the night of Farah's murder, but he was not immediately placed under arrest. The following afternoon, Fratta went to the tanning salon where James Podhorsky worked, and told Podhorsky that "if everybody keeps their mouth shut everything will be all right." After tanning, Fratta approached Podhorsky again to offer some "advice," and told him that "if shit ever hits the fan, just tell them that you went over there to scare her and the first bullet that you shot that went by her head actually grazed her and then you got scared and that's when you fired the second shot." Podhorsky thought that by telling him that, Fratta was trying to shift the direction of the investigation onto him.[4]

The investigation into Farah's murder remained open, and was supervised by Sergeant Danny Ray Billingsley of the Harris County Sheriff's Department. Sgt. Billingsley testified that in March 1995 the investigation came to focus on Howard Guidry. Guidry had been arrested on March 1, 1995, after a bank robbery. When Guidry was arrested, police found a .38 caliber Charter Arms revolver in his back pack. A few days later, Mary Gipp gave a statement to a sheriff's department detective indicating that Guidry had been involved in Farah's murder. The detective retrieved the revolver that had been found in

---

[4] Podhorsky apparently was treated as a suspect by the police for some time; he stated that the encounter at the tanning salon with Fratta on the day after the murder marked a "turning point" in their friendship, although later that night the pair met at Denny's and afterward went to a topless club.

Guidry's possession and requested a check on its registration. Federal firearms records indicated that the revolver had been purchased by Fratta in 1982. In addition, Farah's father identified the revolver as the gun that Farah had given to him for safekeeping in 1993, and that he had returned to Fratta in the summer of 1994. Finally, a Houston Police Department firearms examiner testified that one of the bullet fragments recovered from Farah's garage had been fired from the revolver, and that another one of the bullet fragments, though too damaged to be positively matched to the revolver, had at the least been fired from a weapon of the same manufacturer.

3.    Sgt. Billingsley and the Custodial Confessions

Sgt. Billingsley testified to portions of Guidry's confession, although he omitted any reference to Fratta by name. Sgt. Billingsley told the jury that Guidry told him that: in the late afternoon of November 9, 1994, Guidry and Joseph Prystash drove (in Prystash's gray two-door Nissan) by Farah's house and then to a nearby grocery store; they made a phone call from a mobile phone to a pay phone at the grocery store, to confirm that the pay phone could receive calls; Prystash drove Guidry back to Farah's house and dropped him off there with a revolver and the mobile phone; Guidry climbed the fence into Farah's backyard and waited in a small play house; after some time Guidry called Prystash at the grocery store pay phone to tell him that Farah had not yet returned home, to which Prystash instructed Guidry to keep waiting; a short while later Farah arrived home and pulled into the garage; Guidry left the play house and, after trying to open the side door to the garage but finding it locked, stood outside the door and waited for Farah to open it; Guidry stepped into the garage when Farah opened the door, pointed the revolver at her, and shot her one time in the head; Farah fell to the floor but was still moving, so Guidry shot her a second time in the head; Guidry left the garage, went back to the play house, and used the mobile phone to call Prystash at the grocery store pay phone

and ask to be picked up; Guidry climbed over the fence and hid behind a bush at the corner of Farah's garage until Prystash arrived; and Guidry gave the revolver back to Prystash. Sgt. Billingsley also testified that Guidry told him that he expected to receive $1,000 as remuneration for killing Farah as soon as the shooting was over.

Sgt. Billingsley next testified to portions of a confession given by Prystash, who was arrested shortly after Guidry had confessed. These portions of Prystash's confession largely mirrored the portions of Guidry's confession that were related to the jury. Namely, Sgt. Billingsley told the jury that Prystash said that he (Prystash) had given Guidry a mobile phone (which belonged to Mary Gipp) and a revolver, dropped Guidry off at Farah's house, and then waited at the grocery store pay phone before returning to pick up Guidry. Sgt. Billinsgley further testified that Prystash told him that Guidry was to receive $1,000 for his participation in the murder, and that Prystash was to receive "a couple thousand dollars" and a Jeep.

4. Mary Gipp's Testimony

Mary Gipp testified to her own observations of Prystash, Guidry, and Fratta, but also related to the jury several statements that Prystash had made to her about the murder. Gipp, Prystash, Fratta, and Farah were all regulars at the same gym in Humble, and Gipp dated and lived with Prystash. Gipp testified that about six months before Farah's murder, she noticed that Fratta and Prystash's relationship grew closer, and that they met frequently and talked on the phone often, especially in the weeks leading up to the murder. Gipp recalled one incident at the gym a few weeks prior to Farah's murder in which she had observed Fratta and Prystash go into the locker room together; Gipp was "kind of shocked" and "a little angry" about seeing Fratta and Prystash together and remarked to an acquaintance, Mike Edens, that "Bob wanted Joe to kill Farah."

Gipp next testified about the days leading up to and including the day of Farah's murder, which was a Wednesday. She testified that on the weekend before the murder, she knew that Prystash was going to be involved in the death of Farah and knew when it would occur, but did not notify the police or warn Farah.[5] On the day of the murder, Gipp arrived home to find Guidry seated on the steps leading up to Gipp's and Guidry's apartments. Guidry was dressed in black jeans and a black shirt and stated that he was waiting for Prystash. Gipp went into her apartment; Prystash arrived shortly thereafter but left within a few minutes. Gipp next received a call in the apartment from Prystash, who had Gipp's cell phone and was checking to see if it worked. Around 8:30 p.m. Prystash returned with Guidry. Prystash walked into Gipp's bedroom, unloaded two spent shells from a revolver, and threw them away. The following exchange at trial described what happened next:

> [The State:]      Did you say anything to [Prystash], Mary?
>
> [Gipp:]      No. Yes, I did.
>
> [The State:]      What did you say?
>
> [Gipp:]      I asked [Prystash] if he, if they killed her. * * * I asked him if he killed her.
>
> [The State:]      What did [Prystash] say?
>
> [Gipp:]      He said, Yes.
>
> [The State:]      I asked him how he knew, I asked him if she was dead, if he knew that she was dead and he said yes. And I said how do you know and he said he saw her.
>
> [The State:]      Saw her where, did he say?

---

[5] Gipp explained that she planned to call Farah but "couldn't find the address book."

[Gipp:]                He said that [Guidry] killed her in the garage.

                                 * * *

[The State:]     After [Prystash] threw the bullets in the garbage, did you go back into the living room and continue watching television?

[Gipp:]                I went and took the bullets out of the garbage.

[The State:]     With him still in the house?

[Gipp:]                No, he had left. He had left. He said he had to go meet Bob.

[The State:]     Where is he going?

[Gipp:]                At the Humble gym.

[The State:]     Did he say why he was going to the Humble gym? What he was going to do there?

[Gipp:]                Bob was --

[The State:]     I didn't asked [sic] that. I said did he say what he was going to get there, Mary?

[Gipp:]                Yes.

[The State:]     What was he going to get at the gym?

[Gipp:]                He was going to get a thousand dollars from Bob.

[The State:]     Hey, listen to my question. I asked you what he was going to get?

[Gipp:]                Money.

Gipp also testified that Prystash told her that he was going to receive a Jeep for Farah's murder. After Prystash left, Gipp wrote down the serial number from the revolver that Prystash had unloaded in her bedroom. This number matched

the serial number on the gun that had been purchased by Fratta in 1982 and found on Guidry in March 1995 after the bank robbery. Gipp explained that she hid the two shells she had retrieved from the garbage but later threw them away at Greenspoint Mall.

Gipp also related a conversation she had with Prystash the morning after the murder:

[The State:]    I'm asking you what [Prystash] said [he and Guidry] did the night before. * * *

[Gipp:]    [Prystash] said that [Guidry] was waiting for her in the garage and that he shot her once in the head, and then she flew back and he shot her again.

[The State:]    Okay. Did [Prystash] say anything about dropping [Guidry] off and where he went after dropping him off?

[Gipp:]    He was waiting for [Guidry] at a pay phone.

[The State:]    Okay. What did he say happened after [Guidry] shot her?

[Gipp:]    [Guidry] called him and he said that [Guidry] was waiting for him between two garages somewhere.

Gipp further testified that Prystash replaced a burned-out headlight on his car that morning, and that he later had the car crushed.

5.    Other Evidence

The State also elicited other testimony and produced evidence tending to corroborate certain aspects of the portions of the custodial confessions and Prystash's statements to Gipp that were related to the jury. Phone records showed that Gipp's cell phone was used on the night of Farah's murder to call Farah's house and to make several calls to the grocery store pay phone near Farah's house, and that other calls were made from the mobile phone earlier in

14

the day to Fratta's house, Wyatt's Cafeteria, and Gipp's apartment phone. Phone records from the Catholic church in Humble, where Fratta attended the parents' meeting on the night of Farah's murder, showed that several phone calls were made from the church to Fratta's pager,[6] and that one call was made to a pager registered to Gipp that Prystash routinely used.  The manager of the gym where Fratta and Prystash worked out testified that Prystash arrived at the gym at 9:35 p.m. on the night of the murder, and that the gym closed at 10:00 p.m. that night.  And the State elicited testimony from Farah's divorce lawyer showing that Fratta owned a Jeep.

## C.    The Verdict and Sentence

The jury found Fratta guilty of capital murder.  After the punishment phase of the trial, the jury returned answers to the three special issues in a way that required the imposition of a death sentence.

## D.    Direct Appeal to the Texas Court of Criminal Appeals

On direct appeal, the Texas Court of Criminal Appeals ("CCA") affirmed Fratta's conviction and death sentence.  Relevant to this proceeding is the CCA's resolution of Fratta's Confrontation Clause challenges to the admission of portions of the custodial confessions of Prystash and Guidry through the testimony of Sgt. Billingsley, as well as the portions of Gipp's testimony in which she related statements Prystash made to her.  Under then-prevailing law, the question was whether the out-of-court statements were sufficiently reliable to satisfy the Confrontation Clause; the statements could only be considered reliable if they fell within a firmly rooted exception to the hearsay rule or otherwise had particularized guarantees of trustworthiness.  See Roberts, 448 U.S. at 66.

---

[6] The witness through whom the church phone records were introduced testified that one way for a person to check his messages is by calling his own pager.

As the district court noted, the CCA's adjudication of the Confrontation Clause issues raised in Fratta's direct appeal has caused some confusion. The CCA initially analyzed whether the admission of Prystash's and Guidry's confessions violated Fratta's Confrontation Clause rights by looking to the Supreme Court's Bruton line of cases.[7] As a concurring opinion pointed out, though, the Bruton line of cases addresses the Confrontation Clause implications of situations in which, at a joint trial, hearsay evidence that is not admissible against one defendant is introduced against a co-defendant. Fratta, however, was tried alone, so the Bruton line of cases did not apply. The CCA ultimately withdrew its initial decision and submitted a new one consisting of two opinions, one by Judge Womack and one by Judge Meyers.

1.    The Custodial Confessions

Judge Womack, writing for a majority of five judges, resolved Fratta's Confrontation Clause challenges to the admission of Prystash's and Guidry's confessions by concluding that the confessions had particularized guarantees of trustworthiness and, thus, did not offend the Confrontation Clause. Judge Womack explained that:

> The statements that were admitted in evidence in this case did not attempt to implicate [Fratta] while exonerating the declarants. They did not mention [Fratta] at all, and they fully implicated the declarants as guilty parties. In addition, they were corroborated by the physical evidence at the crime scene, by the observations of other witnesses, by telephone records, by other evidence, and by each other.

---

[7] See Bruton v. United States, 391 U.S. 123 (1968); Richardson v. Marsh, 481 U.S. 200 (1987); Gray v. Maryland, 523 U.S. 185 (1998).

2.     Prystash's Statements to Gipp

Judge Meyers wrote for the unanimous court in rejecting Fratta's Confrontation Clause challenge to Gipp's recitation of Prystash's statements.[8] Importantly, though, Judge Meyers also relied on the Bruton line of cases to offer his own non-majority explanation for why the admission of Prystash's and Guidry's confessions did not offend the Confrontation Clause, and at times linked this non-majority analysis to his consideration of Gipp's recitation of Prystash's statements.

For example, with regard to Prystash's statements to Gipp on the night of the murder (stating that Farah had been killed and that Guidry had killed Farah in the garage), Judge Meyers resolved Fratta's hearsay challenge to these statements by holding that they were admissible into evidence as statements against Prystash's interest.  In a footnote, Judge Meyers then referred to his analysis of the custodial confessions, stating:  "See analysis under [Fratta's challenges to the admission of Prystash's and Guidry's confessions]."  Judge Meyers similarly referred to his analysis of the custodial confessions in resolving Fratta's hearsay and Confrontation Clause challenges to Gipp's recitation of Prystash's statements on the morning after the murder, as follows:

> Under the same analysis as that set out in points of error one through twelve [in which Fratta had challenged the admission of Prystash's and Guidry's confessions], the trial court was within his discretion to determine that this testimony constituted statements against the declarant's (Prystash's) interest and was therefore admissible. Furthermore, because the testimony does not inculpate [Fratta], [Fratta's] confrontation and cross-examination rights are not implicated.

---

[8] Fratta also challenged Gipp's recitation of her own statement to Mike Edens upon seeing Prystash and Guidry enter the locker room together at the gym, but the CCA determined that Fratta had waived this issue on appeal by failing to raise it in the manner required by the Texas Rules of Appellate Procedure.

Finally, Judge Meyers found Prystash's statements that "he had to go meet Bob" at the Humble gym and "was going to get a thousand dollars from Bob" admissible into evidence as co-conspirator statements, but did not appear to explicitly address the Confrontation Clause challenge to these statements.

E.    State Habeas Proceedings

Fratta's state-court habeas corpus application, which was filed while his direct appeal was still pending, did not directly challenge the admission of the custodial confessions and Prystash's statements to Gipp, although the state trial court did find that one of Fratta's ineffective assistance of counsel claims was "essentially a re-working of [Fratta's] direct appeal challenge to the admissibility of [Guidry's and Prystash's] statements." The CCA denied relief and adopted the trial court's findings of fact and conclusions of law. Ex parte Fratta, No. 31,536-02 (Tex. Crim. App. Sept. 22, 2004) (unpublished order). As noted by the district court, where they touched on the admissibility of the custodial confessions, these findings of fact and conclusions of law essentially replicated the CCA's decision on direct appeal.

F.    Federal Habeas Proceedings

Fratta next filed a 28 U.S.C. § 2254 petition for writ of habeas corpus in the United States District Court for the Southern District of Texas, alleging fifteen claims for relief. The State filed a motion for summary judgment, which was granted in part and denied in part. The district court denied the State's motion for summary judgment on Fratta's claims involving the admission of the custodial confessions and Prystash's statements to Gipp, and conditionally granted relief on these claims. The district court granted the remainder of the State's motion, denying Fratta's remaining claims, and denied a certificate of appealability ("COA") on these claims.

1.   The Custodial Confessions

The district court first held that the CCA's adjudication of Fratta's Confrontation Clause challenge to the admission of Prystash's and Guidry's confessions through the testimony of Sgt. Billingsley was contrary to, and involved an unreasonable application of, federal law.  The CCA, per Judge Womack, had held that these statements were sufficiently reliable under the Confrontation Clause because they possessed particularized guarantees of trustworthiness, and in support of this conclusion reasoned that the statements were corroborated by other evidence at trial, including physical evidence at the crime scene, the observations of other witnesses, telephone records, and each other.  The district court determined that this approach was contrary to Supreme Court precedent, since in Idaho v. Wright, 497 U.S. 805 (1990), the Court had rejected the notion that corroborating evidence may be used to support a finding that a hearsay statement bears particularized guarantees of trustworthiness.

The district court further determined that the CCA erred in its reliability analysis when it considered the confessions only in their redacted form (as related to the jury by Sgt. Billingsley, who omitted any reference to Fratta), rather than in their entirety.[9]  The district court reasoned that the statements, when viewed in their entirety, were not reliable because:  (1) the statements had been given in police custody; and (2) each statement, though self-inculpatory, unevenly and contradictorily spread the blame for the killing.

---

[9] After considering only "the statements that were admitted in evidence," the CCA concluded that the statements had particularized guarantees of trustworthiness because they "did not attempt to implicate [Fratta] while exonerating the declarants," and "did not mention Fratta at all." (Emphasis added.)

19

2.    Prystash's Statements to Gipp

The district court also determined that the admission of Prystash's statements to Gipp violated Fratta's Confrontation Clause rights.  The district court noted that Judge Meyers's opinion for the unanimous CCA on this issue had "piggybacked" on his non-majority analysis of Fratta's challenge to the custodial confessions, an analysis that misapplied federal law by relying on the Bruton line of cases.

In finding that the admission of Prystash's statements to Gipp was error, the district court reasoned that "[t]he record gives no basis upon which to evaluate Prystash's credibility when he allegedly made the statements."  It also found persuasive this court's determination, in affirming a grant of habeas relief in Guidry's case, that similar testimony by Gipp in Guidry's trial constituted a violation of the Confrontation Clause.  See Guidry v. Dretke, 397 F.3d 306, 328–30 (5th Cir. 2005) (affirming grant of habeas relief based on Confrontation Clause violation in admitting Prystash's statements to Gipp at Guidry's trial).

3.    Harmless Error Analysis

Finally, the district court determined that the error resulting from the introduction of Prystash's and Guidry's confessions and Gipp's hearsay-laden testimony could not be considered harmless.  The district court reasoned that though there was admissible circumstantial evidence suggesting that Fratta was somehow involved in Farah's murder, the indictment required proof of a murder-for-hire plot—specifically, proof that the plot involved remuneration in the form of money or a Jeep—and that the statements admitted in violation of the Confrontation Clause had impacted the consideration of this issue, and had a substantial and injurious effect on the trial.

The State filed timely notice of appeal, and Fratta filed an application in this court for a COA on his remaining claims.

## II. STANDARD OF REVIEW AND AEDPA CONSIDERATIONS

In reviewing a grant of habeas relief, we examine factual findings for clear error and review issues of law de novo. Barrientes v. Johnson, 221 F.3d 741, 750 (5th Cir. 2000). When examining mixed questions of law and fact, we use a de novo standard by independently applying the law to the facts found by the district court, as long as the district court's factual findings are not clearly erroneous. Id. Whether a defendant's Confrontation Clause rights were violated is a mixed question of law and fact. Horn v. Quarterman, 508 F.3d 306, 312 (5th Cir. 2007); see also Lilly v. Virginia, 527 U.S. 116, 136 (1999) (plurality opinion) (whether a hearsay statement has particularized guarantees of trustworthiness is a "fact-intensive, mixed question[] of constitutional law" subject to independent review by appellate courts).

This habeas proceeding is subject to AEDPA because Fratta filed his petition on September 21, 2005, well after AEDPA's effective date. See Lindh v. Murphy, 521 U.S. 320, 336–37 (1997). Under AEDPA, a federal court may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's factual findings are "presumed to be correct," although a habeas petitioner may rebut this presumption by "clear and convincing evidence." Id. § 2254(e)(1).

## III. DISCUSSION

The Confrontation Clause of the Sixth Amendment—which is made applicable to the states by the Fourteenth Amendment—provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

the witnesses against him." U.S. CONST. amend. VI; Pointer v. Texas, 380 U.S. 400, 403 (1965). "If one were to read this language literally, it would require, on objection, the exclusion of any statement made by a declarant not present at trial." Roberts, 448 U.S. at 63. This approach has been rejected, though, as "unintended and too extreme." Id.

Nonetheless, the Supreme Court has recognized that "the Confrontation Clause reflects a preference for face-to-face confrontation at trial, and that 'a primary interest secured by [the provision] is the right of cross-examination.'" Id. (quoting Douglas v. Alabama, 380 U.S. 415, 418 (1965)) (footnote omitted). In Ohio v. Roberts, the Court set forth a "general approach" for determining when hearsay is admissible without violating the Confrontation Clause.[10] Id. at 65. Under the Roberts framework,

> when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

Id. at 66 (footnote omitted).[11]

---

[10] As noted above, the Supreme Court dramatically altered Confrontation Clause doctrine with its decision in Crawford v. Washington, but has also decided that the rule announced in Crawford is not retroactive to cases already final on direct review. See Bockting, 127 S. Ct. at 1177. Thus, we set out here the pre-Crawford law that was in effect when Fratta's direct appeal became final.

[11] In line with its statement that a showing of unavailability is only "normally" required, the Court stated in a footnote in Roberts that a "demonstration of unavailability . . . is not always required," 448 U.S. at 65 n.7, and later clarified in a subsequent case that "the unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding." White v. Illinois, 502 U.S. 346, 354 (1992).

When an out-of-court statement does not fall within a firmly rooted hearsay exception, the "'particularized guarantees of trustworthiness' required for admission under the Confrontation Clause must . . . be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." Wright, 497 U.S. at 820. Evidence admitted under this requirement must be "so trustworthy that adversarial testing would add little to its reliability." Id. at 821. The presumption is against the admission of out-of-court statements: "[U]nless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement." Id.

A.    The Custodial Confessions

On appeal, the State does not contest the district court's determination that the CCA's adjudication of Fratta's Confrontation Clause challenge to the admissibility of the custodial confessions resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law, or its determination that a Confrontation Clause violation occurred. Nonetheless, we briefly examine these issues and explain why the district court was correct in concluding that Guidry's and Prystash's confessions do not bear the indicia of reliability required by the Confrontation Clause.

First, the CCA's use of corroborating evidence—such as phone records and physical evidence—to support the confessions' trustworthiness was contrary to clearly established federal law. This type of "bootstrapping" contravenes the Supreme Court's clear dictate that "hearsay evidence . . . must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." Id. at 822.

Second, and as noted by the district court, the CCA also erred in analyzing only the portions of Prystash's and Guidry's confessions that were related to the jury by Sgt. Billingsley. The Supreme Court has made clear that courts must look to the "totality of circumstances" in considering whether a statement possesses the particularized guarantees of trustworthiness required by the Confrontation Clause. Id. at 820. Accordingly, "it is not just the portions of the statement that are offered into evidence that are considered when the court is determining the trustworthiness of the statement, the redacted portions are considered as well." United States v. Bell, 367 F.3d 452, 468 n.8 (5th Cir. 2004) (citing United States v. Alvarez, 584 F.2d 694, 701 (5th Cir. 1978)). The reliability analysis requires that the statements be examined in their entirety, not just in the redacted form presented to the jury by Sgt. Billingsley.

Viewing the custodial confessions within the totality of the circumstances and in their entirety, the district court was correct in concluding that the statements were not sufficiently trustworthy to pass muster under the Confrontation Clause. Guidry and Prystash both confessed while in police custody and incriminated Fratta in their confessions. Such confessions are "presumptively unreliable," Lee v. Illinois, 476 U.S. 530, 541 (1986), as "[w]hen a suspect is in custody for his obvious involvement in serious crimes, his knowledge that anything he says may be used against him militates against depending on his veracity." Lilly, 527 U.S. at 138 (plurality opinion). Ordinarily, then, "a confession of an accomplice resulting from formal police interrogation cannot be introduced as evidence of the guilt of an accused, absent some circumstance indicating authorization or adoption." Lee, 476 U.S. at 541–42 (internal quotation marks and citation omitted).

Moreover, as the district court noted, the content of the confessions does not inspire a high level of confidence in their reliability. The unredacted confessions (of which there are actually three, since Guidry gave two conflicting

24

statements), though inculpatory of the respective declarants, nevertheless attempt to minimize each declarant's involvement and intent, lessen each declarant's culpability, and spread the blame to the other parties—as discussed at length in the district court's thorough memorandum and order. Suffice it to say here that given the contradictory, inconsistent, and self-serving nature of the custodial confessions, the general presumption of unreliability has not been rebutted.

## B. Prystash's Statements to Gipp

The State does challenge the district court's determination that habeas relief could be granted based on Gipp's recitation of Prystash's out-of-court statements. The State argues that the admission of these statements was consistent with the Confrontation Clause because the statements bear particularized guarantees of trustworthiness.

### 1. AEDPA Considerations

We first consider whether the district court was correct in concluding that AEDPA does not bar granting habeas relief on Fratta's claim relating to Gipp's recitation of Prystash's statements. Under AEDPA, a federal court may not grant habeas relief on behalf of a state prisoner on any claim that was adjudicated "on the merits" in state court unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" clearly established federal law if: (1) the state court "applies a rule that contradicts the governing law" announced in Supreme Court cases; or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts. Terry Williams v. Taylor, 529 U.S. 362, 405–06 (2000); see also Mitchell v. Esparza, 540 U.S. 12, 15–16 (2003). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state

25

court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. The federal court "may grant the writ if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Additionally, an "unreasonable application" may also occur "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

The district court was correct in concluding that the requirements of Section 2254(d)(1) have been met in this case. As an initial matter, we note that on direct appeal Fratta raised several points of error challenging different portions of Prystash's statements to Gipp on Confrontation Clause grounds. The CCA grouped some, but not all, of these points of error together when considering Fratta's claims, so its adjudication actually resulted in several decisions.

First, the CCA resolved Fratta's state-law evidentiary challenge to the admission of Prystash's hearsay statements on the night of the murder admitting that he and Guidry had killed Farah by finding these statements admissible into evidence under the hearsay exception for declarations against penal interest. But the fact that the statements were admissible under a state-law hearsay exception for declarations against penal interest did not dispose of the Confrontation Clause issue, for, as the CCA elsewhere recognized, "the use of such statements to inculpate another defendant is not within a firmly rooted exception to the hearsay rule" for Confrontation Clause purposes. Instead, the CCA apparently intended to resolve the Confrontation Clause challenge to these statements by referring, in a footnote, to Judge Meyers's non-majority analysis of Fratta's challenge to the admission of the custodial confessions, which relied on the Bruton line of cases. Bruton and its progeny are concerned with the

26

question whether, in the context of a joint or multi-defendant trial, the admission of hearsay against one defendant (such as the defendant's own confession) violates the Confrontation Clause rights of a co-defendant against whom the hearsay is not admissible but nonetheless incriminating. For such situations, the rule established by the Court is that the co-defendant's Confrontation Clause rights are not violated if the hearsay only incriminates the co-defendant "inferentially" in a way that will be possible for the jury to put out of mind. See Gray, 523 U.S. at 195–96. But when the question is simply whether the Confrontation Clause allows for the admission of a hearsay statement against a particular defendant, the analysis does not turn on the degree of inference required for incrimination; rather, the question is whether the statement is sufficiently reliable under Roberts. In invoking Bruton, then, the CCA applied a rule that contradicts the governing law in this case. Moreover, it was unreasonable for the CCA to extend the rule of Bruton, which applies in the context of joint or multi-defendant trials, to the context of a single-defendant trial like Fratta's. The district court was thus correct in determining that the CCA's decision was contrary to, and involved an unreasonable application of, clearly established federal law.[12]

Similar problems exist with the CCA's decision holding Prystash's statements on the morning after the murder admissible under the Confrontation Clause—as the district court noted, there is again a reference to the faulty non-majority analysis which misapplies federal law in drawing on the Bruton line of cases. Moreover, to the extent that the CCA decided that "because the testimony

---

[12] We recognize that there is some debate as to whether Judge Meyers's references to the analysis of the custodial confessions should be taken to refer to his own non-majority opinion on that issue or the majority opinion that Judge Meyers did not join. While we think it clear that Judge Meyers was referring to his own non-majority analysis, the result would not differ if we were to decide otherwise, because the majority's decision on the issue of the custodial confessions was itself contrary to, and an unreasonable application of, clearly established federal law, as discussed above.

27

does not inculpate [Fratta], [Fratta's] confrontation and cross examination rights are not implicated," this decision is also contrary to clearly established federal law, as conditioning the statements' admissibility under the Confrontation Clause on their inculpatory effect contradicts governing law that requires that the statements be evaluated based on their reliability.

Turning to the CCA's decision that Prystash's statements that he "had to go meet Bob" and was "going to get a thousand dollars from Bob" were admissible into evidence under the co-conspirator exception to the hearsay rule,[13] we initially note that we are unsure whether this determination represents an "on the merits" adjudication of Fratta's Confrontation Clause claim, since it does not appear to explicitly address any federal constitutional arguments. However, one of the cases that the CCA cited in its discussion of the co-conspirator exception is Bingham v. State, 915 S.W.2d 9 (Tex. Crim. App. 1994), which contains a concurrence that cites Bourjaily v. United States, 483 U.S. 171 (1987), where the Supreme Court held that statements admissible under the co-conspirator exception contained in the federal rules of evidence fall within a firmly rooted hearsay exception for Confrontation Clause purposes. We take the citation to Bingham to represent the CCA's determination that Prystash's statements do not violate the Confrontation Clause because they fall within a firmly rooted hearsay exception.

The CCA is of course the final authority on the question whether, as a matter of state evidentiary law, Prystash's statements fit within the exception to the hearsay rule for statements of co-conspirators. But the CCA's characterization of these statements for purposes of state evidentiary law does not resolve the Confrontation Clause issue, as "[t]he Supreme Court has rejected

---

[13] It is probably not entirely correct to speak of a co-conspirator "exception" to the hearsay rule in this case, since the Texas Rules of Criminal Evidence in effect at the time of Fratta's trial actually defined co-conspirator statements as non-hearsay. That being said, in keeping with common parlance, we will refer to the co-conspirator rule as a hearsay exception.

the argument that a state court determination admitting hearsay under state law is dispositive of a petitioner's habeas claim that his constitutional confrontation rights were violated by the admission." Paxton v. Ward, 199 F.3d 1197, 1208 (10th Cir. 1999) (citing Lee, 476 U.S. at 539). Rather, "the question whether the statements fall within a firmly rooted hearsay exception for Confrontation Clause purposes is a question of federal law." Lilly, 527 U.S. at 125 (plurality opinion); see also Winzer v. Hall, 494 F.3d 1192, 1198 (9th Cir. 2007).

In Bourjaily, where the Supreme Court examined the history of the co-conspirator exception to the hearsay rule and found it to be firmly rooted, the Court made clear that such statements must have been "made in the course and in furtherance of the conspiracy" to qualify as statements falling within a firmly rooted hearsay exception for Confrontation Clause purposes. 483 U.S. at 183. Prystash's statements to Gipp do not meet this requirement. Indeed, as the CCA explained in Guidry's direct appeal, "Prystash's statements to Gipp did nothing to advance the cause of or facilitate the conspiracy. The statements were not made in an effort to enlist Gipp's assistance or cooperation, elicit information that could be used in the conspiracy, or do anything other than report the status of the conspiracy to Gipp. Prystash was merely describing to Gipp what was occurring or what had occurred." Guidry v. State, 9 S.W.3d 133, 148 (Tex. Crim. App. 1999). The State apparently recognizes as much and has not advanced any arguments relating to the co-conspirator exception; indeed, at oral argument counsel for the State expressly disclaimed any reliance on the co-conspirator exception. Because Prystash's statements were not made in the course and in furtherance of a conspiracy, as a matter of federal law they do not fall within a firmly rooted hearsay exception for Confrontation Clause purposes, and the CCA's decision to the contrary was objectively unreasonable.

Finally, we offer these additional thoughts in response to the State's assertion that the district court improperly reviewed the CCA's reasoning, rather than its ultimate decision. The State correctly notes that the "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). But from this premise the State appears to suggest that the district court was powerless to consider anything but the state court's ultimate decision finding no Confrontation Clause error. This argument is most obviously flawed in that it ignores the fact that the "unreasonable application" test is but one of two clauses in Section 2254(d)(1) which permit habeas relief to be granted, the other being the "contrary to" test. Section 2254(d)(1) is "unmistakably disjunctive, and the Supreme Court has held that independent meaning must be given to both the statute's 'contrary to' clause and its 'unreasonable application of' clause." Robertson v. Cain, 324 F.3d 297, 302 (5th Cir. 2003) (citing Williams, 529 U.S. at 404–05, 412–13). And in assigning meaning to the "contrary to" clause, the Court clearly has contemplated that a federal court will sometimes look beyond the state court's ultimate decision—for example, to determine if the state court applied a rule that contradicts governing law. See Williams, 529 U.S. at 405–06. Additionally, while it is certainly true that when the state court has identified the correct governing legal principle, the federal court's "unreasonable application" determination is limited to examining the state court's ultimate legal conclusion (and not the "method by which the state court arrives at its conclusion"), see Neal, 286 F.3d at 244–46, in other situations the "unreasonable application" determination may permissibly take a different form—for example, the question whether the state court has "unreasonably extend[ed] a legal principle . . . to a new context where it should not apply (or unreasonably refuse[d] to extend a legal principle to a new context

where it should apply)," Williams, 529 U.S. at 408, will certainly require consideration of more than the state court's ultimate decision. The bottom line is that satisfaction of either the "contrary to" or the "unreasonable application" test—under any of the multiple scenarios described by the Court—will free the federal court from the constraints of Section 2254(d)(1). See id. at 406; Robertson, 324 F.3d at 302.

### 2. Confrontation Clause Analysis

Having determined that the district court was correct in concluding that AEDPA does not bar granting habeas relief on Fratta's challenge to Gipp's recitation of Prystash's statements, we turn now to the question whether a Confrontation Clause violation occurred.

The Confrontation Clause analysis under Roberts conditions the admission of hearsay on its reliability. For Prystash's statements to Gipp to be admissible, they must fall within a firmly rooted hearsay exception (where reliability can be inferred) or be excluded unless a showing of particularized guarantees of trustworthiness is made. Roberts, 448 U.S. at 66. The State does not contend that the statements fall within a firmly rooted hearsay exception; rather, it argues that they possess particularized guarantees of trustworthiness, and thus that their admission at Fratta's trial did not offend the Confrontation Clause.

Supreme Court precedent teaches that a finding of particularized guarantees of trustworthiness must be shown from the totality of the circumstances that surround the making of the statement, and may not be based on other evidence at trial that may corroborate the statement. See Wright, 497 U.S. at 819. In support of its argument that Prystash's statements to Gipp are trustworthy, the State relies on Ramirez v. Dretke, 398 F.3d 691 (5th Cir. 2005). In that case, the habeas petitioner, Ramirez, had been convicted of the capital murder of his ex-wife's boyfriend, a fireman, and sought a COA for his Confrontation Clause claim challenging the admission at his trial of certain out-

of-court statements made by his accomplice in the murder, Bell. Id. at 693, 695. Bell had made the following out-of-court statements to a friend: Bell said that Ramirez had hired him to kill a fireman for $1,000, and that he and Ramirez had called the fireman to a third-party's house on the pretense of repairing a washer, handcuffed him, shot him with a shotgun, and buried him on the property. Id. at 693. We denied Ramirez's request for a COA, reasoning that Bell's statements were supported by particularized guarantees of trustworthiness:

> Bell had not been arrested and was not in police custody when he implicated Ramirez in [the] murder. Indeed, he made at least one statement implicating Ramirez before the murder was even committed. Bell spontaneously initiated the conversations implicating himself and Ramirez in [the] murder, and he made those statements to the friend with whom he was staying . . . . [W]hile Bell's statements had the effect of implicating Ramirez as well as himself, Bell had no apparent incentive at the time of these statements to risk implicating himself and no apparent reason to believe that his statements might result in leniency in any subsequent criminal prosecution.

Id. at 696. The State likens the circumstances surrounding the out-of-court statements in Ramirez to the circumstances of Prystash's statements to Gipp. The State argues that, like Bell, Prystash made the statements to a friend (his girlfriend, in fact), was not in police custody when he made the statements, and had no apparent reason to believe that making the statements would result in leniency in any subsequent criminal prosecution, and that the statements are thus similarly trustworthy.

There is of course no "mechanical test" for determining whether a hearsay statement possesses the particularized guarantees of trustworthiness required by the Confrontation Clause. Wright, 497 U.S. at 822. Rather, the reliability inquiry is a highly fact-specific one that requires careful consideration of the particular statement at issue. While we recognize the existence of some similarities between the circumstances surrounding the statements in Ramirez

and the circumstances in which Prystash made the statements to Gipp, we ultimately are not persuaded that the Prystash's statements are sufficiently trustworthy to be admissible under the Confrontation Clause.

Our examination of the circumstances and content of Prystash's statements to Gipp and the statements made in Ramirez reveals several differences that we believe significantly undermine the case for the reliability of Prystash's statements. First, we note that Bell's statements in Ramirez did not attempt to minimize his own culpability at the expense of another. Instead, Bell made it clear that he had participated on an equal basis with Ramirez in actually carrying out the killing—Bell stated that he and Ramirez acted together in luring the victim to the location under false pretenses, handcuffing him, shooting him, and burying him. No effort was made to assign a more culpable role in carrying out the killing to Ramirez. In contrast, in his statements to Gipp, Prystash specifically assigned the role of the triggerman to Guidry, and limited his own involvement to dropping off and picking up Guidry. Prystash's clear delineation of these roles calls into question the reliability of his statement. Although it is true that both the triggerman and the driver are potentially subject to the same criminal liability, there are nonetheless differences between these roles that might later work to the driver's advantage. For example, the driver might be in a better position to seek a deal in exchange for cooperating with the authorities or testifying against the shooter, or might be able to portray himself as less culpable and thus more deserving of leniency in sentencing.

Second, in Ramirez we noted that Bell had spontaneously initiated the conversations incriminating himself and Ramirez in the murder, with the implication being that statements made spontaneously are more likely to be reliable. See Ramirez, 398 F.3d at 696. Here, though, Prystash's statements were not entirely spontaneous—Gipp's testimony at trial indicates that

Prystash's statements on the night of the murder were in response to her own repeated questions.

Third, while portions of Prystash's statements, like Bell's, were self-incriminating, we do not think that this fact serves as a particularly strong guarantee of trustworthiness under the specific circumstances of this case. Gipp testified that she had some idea that Farah was going to be killed (although she apparently did not know the exact details of the plot). Given her knowledge, it seems unlikely that Prystash could have plausibly denied any involvement in the murder to Gipp. There is no assurance, however, that when questioned by Gipp his account was particularly reliable, or that he did not put his own spin on things. In fact, he would have had good reason to do so. We know from Gipp's own testimony that she was angry about the idea of Farah being killed. Prystash was Gipp's boyfriend, lived with her, and apparently depended on her to some extent for support (Prystash occasionally worked on cars but had no regular job). He thus had an incentive to minimize or distort the extent of his involvement and to attempt to shift the blame to other parties, in order to placate and stay in good graces with Gipp.

Finally, it must be noted that we have already considered a challenge to many of these very same statements of Prystash to Gipp, in the context of a habeas petition filed by Guidry, and found that their admission through the testimony of Gipp violated the Confrontation Clause. See Guidry, 397 F.3d at 329.[14] At Guidry's trial, Gipp testified to the statements made by Prystash

---

[14] Guidry was decided by this court in early 2005, shortly after Crawford was decided and well before the Supreme Court held that Crawford does not apply retroactively, so it is perhaps not surprising that the opinion contains some references to Crawford. However, we do not read the decision in Guidry as resting entirely on Crawford, particularly in light of the fact the we approvingly excerpted quotations from both the CCA's opinion and the district court's opinion on the subject of the statements' reliability (both courts had evaluated Guidry's claims under pre-Crawford law), and specifically stated that the district court's conclusion was correct.

implicating Guidry in the murder, including Prystash's statement that Guidry shot Farah in the head, that Prystash then picked up Guidry from the scene, and that Guidry was to receive $1,000 from Fratta. Id. at 329. After his conviction was affirmed by the CCA, Guidry was granted habeas relief by the federal district court, in part based on a conclusion that Gipp's recitation of Prystash's statements at Guidry's trial violated the Confrontation Clause. Id. at 329–30. We agreed with this conclusion on appeal, and specifically noted the CCA's pronouncement that it was "'doubtful [Prystash's statements] possessed particularized guarantees of trustworthiness . . . .'" Id. at 329 (quoting Guidry, 9 S.W.3d at 151) (additional internal quotation marks omitted). The State has provided us with no compelling reason to conclude that the Confrontation Clause issue in Guidry's habeas case was wrongly decided by this court. Moreover, it has not persuaded us that the CCA's doubt about the trustworthiness of these statements in Guidry's direct appeal was misplaced. Our own examination of the circumstances surrounding Prystash's statements permits us to say that, at the very least, we share a similar doubt. Taking into consideration the general presumption against the reliability of hearsay statements, Wright, 497 U.S. at 821, the district court did not err in determining that the Confrontation Clause was violated when Prystash's statements to Gipp were admitted at Fratta's trial.[15]

---

[15] We note that should the State seek to re-try Fratta, the question of the admissibility of the custodial confessions and Prystash's statements to Gipp will not be governed by the reliability framework established in Roberts. Instead, the Confrontation Clause analysis will focus on whether these statements are "testimonial." See Crawford, 541 U.S. at 61–62; Davis v. Washington, 547 U.S. 813, 823–24 (2006). Since neither party has argued that the statements should or should not be considered "testimonial," or even argued that this question has any relevance to Fratta's habeas petition, cf. Jackson v. McKee, 525 F.3d 430, 437–38 (6th Cir. 2008), we of course offer no opinion on this issue.

## C. Harmless Error Analysis

Confrontation Clause violations are subject to harmless error analysis. See Horn, 508 F.3d at 322 n.24 (citing Coy v. Iowa, 487 U.S. 1012, 1021 (1988)); see also Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986). In Brecht v. Abrahamson, the Supreme Court addressed the issue of harmless error in the context of collateral review and determined that "habeas petitioners . . . are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"[16] 507 U.S. 619, 637 (1993) (citation omitted). The test, which the court adopted from Kotteakos v. United States, 328 U.S. 750 (1946), is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Id. (quoting Kotteakos, 328 U.S. at 776). The Brecht standard requires an examination of the entire record, "so as to fully consider all the ways in which the complained-of error could have infected the course of the . . . trial." Cupit v. Whitley, 28 F.3d 532, 538 n.18 (5th Cir. 1994) (emphasis in original).

The district court, applying Brecht, determined that the admission of Prystash's statements to Gipp, in conjunction with the admission of the custodial confessions, had a substantial and injurious effect in determining the jury's verdict at Fratta's trial.[17] The State has not contested this determination on

---

[16] The Court distinguished between "trial error," which is amenable to harmless error analysis, and "structural defects," which are not and require automatic reversal. Brecht, 507 U.S. at 629–30. The admission of evidence in violation of the Confrontation Clause constitutes "trial error" because it "occur[s] during the presentation of the case to the jury" and its effect "may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." Id. at 629 (brackets and ellipsis in original, internal quotation marks and citation omitted); see also Winzer, 494 F.3d at 1201.

[17] Neither the State nor Fratta argues against the application of Brecht in this case. Cf. Calderon v. Coleman, 525 U.S. 141, 148 (1998) (Stevens, J., dissenting). Pursuant to the Supreme Court's decision in Fry v. Pliler, 127 S. Ct. 2321 (2007), the fact that the CCA failed to recognize the Confrontation Clause errors at Fratta's trial and thus did not review for harmlessness under the "harmless beyond a reasonable doubt standard" set forth in Chapman v. California, 386 U.S. 18 (1967), does not bar the use of the "less onerous" Brecht standard on

appeal, and we agree with the district court that the Brecht standard has been satisfied here.

The admissible evidence at Fratta's trial suggested that Fratta, Prystash, and Guidry were, to varying degrees, somehow involved in Farah's death. Farah's neighbors testified that they saw a black man near Farah's garage shortly after the shooting (Guidry is black), and that this man was picked up by a car with a burned-out headlight that matched the description of Prystash's car. Gipp testified that: Fratta and Prystash's relationship grew closer in the time leading up to the murder; on the day of the murder Guidry was dressed in black and waiting for Prystash on the steps leading to her apartment; Prystash came home and left shortly thereafter; Prystash returned with Guidry around 8:30 that night; and Prystash entered Gipp's room and unloaded two shells from a revolver. The serial number recorded from this revolver by Gipp matched the serial number of the gun recovered from Guidry after the bank robbery. Federal records established that Fratta had purchased the revolver, and a firearms examiner determined that it had fired at least one of the bullets recovered from the scene of the crime. Phone records tended to show that Fratta and Prystash were in contact on the day of the murder, and numerous witnesses described how Fratta talked openly about killing or having someone kill Farah and asked several people if they or anybody they knew would kill Farah. Law enforcement officials also found $1,050 in cash in Fratta's car on the night of the murder.

As the district court noted, though, the State's burden was to produce affirmative proof that a murder-for-hire had occurred, and on this point the admissible evidence was far from conclusive. By the terms of the indictment, the State was required to prove that Fratta employed Prystash or Guidry to kill Farah in exchange for remuneration in the form of money or a car. As an initial

collateral review.

matter, the admissible evidence connecting Prystash and Guidry to the murder was hardly overwhelming. Farah's neighbors saw a black man at the scene but did not positively identify this man as Guidry; they even gave testimony suggesting that the man could have been white. And, though the revolver was found in Guidry's possession when he was arrested in March 1995, this was almost four months after the murder. It was only through the admission of the custodial confessions and Prystash's statements to Gipp that the jury was presented with a coherent picture of how the crime was carried out. As the State explained in its opening argument: "Had it not been for Mary Gipp, the police could have never put Joe Prystash and Howard Guidry together and without those two connections and their eventual arrest, you would have never heard about or [sic] this defendant wouldn't be sitting here today."

Moreover, on the crucial point of whether Fratta had engaged Prystash or Guidry to commit the murder for remuneration, the inadmissible evidence was vital to the State's case. In the context of challenges to the sufficiency of the evidence of remuneration in capital murder prosecutions, the CCA has defined the concept of remuneration broadly to include "the idea of a reward given or received because of some act." Rice v. State, 805 S.W.2d 432, 434 (Tex. Crim. App. 1991) (citation omitted). At the same time, though, the court has "noted that under the remuneration section, the State has the heavy burden of demonstrating that the murder was performed for the reason of pecuniary gain." Id. at 435. In its opening argument, the State, recognizing the importance of proving the element of remuneration, informed the jury that:

> You will learn from the evidence that in return for Prystash's subcontracting in this case he was going to receive [Fratta's] Jeep. And you will learn that for Howard Guidry's involvement in this case as the shooter of Farah Fratta, he was going to receive $1,000.

The evidence offered by the State in support of these allegations, however, consisted entirely of hearsay statements attributed to Prystash and Guidry and

38

introduced to the jury through Sgt. Billingsley and Gipp. Although $1,050 was found in Fratta's car on the night of the murder, there was no admissible evidence tying this money to Guidry. Nor was there evidence showing that Fratta's Jeep had been promised to Prystash. Rather, it was the custodial confessions and Prystash's statements to Gipp that the State relied on to meet its "heavy burden" of showing that Farah's murder was performed for pecuniary gain. It thus can hardly be doubted that the admission of this evidence had a substantial and injurious effect in determining the verdict at Fratta's trial. The district court was correct in holding that the Confrontation Clause violations that occurred at Fratta's trial did not constitute harmless error.

Given our conclusion that the admission of the custodial confessions and Prystash's statements to Gipp violated the Confrontation Clause, the above discussion is sufficient to dispose of the harmless error question. Nevertheless, we feel compelled to observe that our review of the record in this case has left us convinced that even were we to assume the admissibility of Prystash's statements to Gipp, the error in admitting the custodial confessions alone would still have been harmful under Brecht.

The State's harmless error argument was premised on finding Gipp's recitation of Prystash's statements admissible; this testimony, the State's argument goes, would then have provided the evidence necessary to establish that Fratta agreed to pay to have his wife killed, in effect rendering harmless the error in admitting the custodial confessions. But the fact that the evidence exclusive of the custodial confessions may have been sufficient to sustain a guilty verdict does not alone suffice to establish that the error in admitting the confessions was harmless under Brecht. See Hogue v. Johnson, 131 F.3d 466, 500 n.64 (5th Cir. 1997). As we explained in Cupit, 28 F.3d at 538, in reviewing for harmlessness, we "must heed the caution contained in Kotteakos itself":

> The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

Kotteakos, 328 U.S. at 765.[18]

The effect of the admission of the custodial confessions at Fratta's trial cannot be described as anything less than substantial. Though Mary Gipp's testimony offered a rough sketch of the details of Farah's murder (she told the jury that Prystash told her that Farah had been killed, that Guidry had shot Farah twice in the garage, and that Prystash had served as the driver), it was only through the custodial confessions related by Sgt. Billingsley that the jury was presented with a truly comprehensive account of Farah's murder. Through Sgt. Billingsley, the jury heard a detailed, narrative account of how the crime was carried out—how Guidry laid in wait in the play house in Farah's backyard ("stalking his victim," as the State described it in its closing argument); how, when Farah returned, Guidry stood outside the door and waited for her to open it; how after the first shot he turned to leave but then, noticing that Farah was still moving, stopped and shot her once more in the head before returning to the play house to call Prystash and tell him that "he was through." And in conjunction with his testimony, Sgt. Billingsley explained how, at around 2:00 in the morning, he conducted a walk-through of the crime with Guidry, in which Guidry was taken to the grocery store for the purpose of identifying the pay phone where Prystash waited, and then taken to Farah's residence, the scene of the crime. As Sgt. Billingsley related the confession, then, the jury was in effect

---

[18] We do not mean to suggest that, in conducting the harmless error analysis, courts may not consider whether improperly admitted evidence is "cumulative" of other properly admitted evidence. Cf. ShisInday v. Quarterman, 511 F.3d 514, 523–24 (5th Cir. 2007). As we explain below, though, the custodial confessions contained evidence that was not cumulative of any other source, and in any event had a substantial and injurious effect on the jury's verdict.

invited to picture Guidry, in the darkness of night, re-enacting the crime. This testimony has a powerful emotional effect. And added to the effect of all this was the State's production of Prystash and Guidry in the courtroom, for purposes of identification by Sgt. Billingsley and another law enforcement officer. Thus the State made good on its promise to the jury during its opening argument that "You are going to get to meet or see Joseph Prystash and Howard Guidry."

The State further magnified the effect of the custodial confessions at closing argument through the presentation of a narrative account of the crime that drew on, and highlighted details found only in, the custodial confessions. This narrative was then interlaced with a series of rhetorical questions suggesting that only Fratta could have provided Prystash and Guidry with the knowledge to act as they did in committing the crime. Thus, after describing Prystash and Guidry's initial drive by Farah's house on the afternoon of the murder, in which the pair was effectively casing the scene of the crime (a detail revealed only though the confessions), the State asked:

> How do they know where Farah Fratta lives? How do they know what time Farah is going to get home? How do they know what her daily regimen[] is? That she goes to the Y in the evening? How do they know? Who told them? Who told them there was a play house in the back yard for hiding? Who gave them the layout of the garage?

Similarly, after describing how Guidry waited in the play house for Farah to return home (another detail revealed only through the confessions), the State asked: "How did Guidry know there was a play house in the back yard? How did he know where to hide? Who told him? Who told him?" The implication of these questions, which depended entirely on details of the crime revealed only through the custodial confessions, was clear—that only someone close to Farah would have been able to supply Prystash and Guidry with the information necessary to carry out the crime, and that Fratta was that person.

Finally, it must also be noted that the effect of the custodial confessions on the jury was undoubtedly enhanced by the fact that they were related through the testimony of Sgt. Billingsley, a law enforcement officer who could command the jury's respect. The only other source of the information contained in the confessions (and a much more limited source, at that) was Mary Gipp, who was far from an ideal witness. Even the State, in its closing arguments, cast aspersions on Gipp's character and truthfulness, stating that Gipp may have been an accomplice to the crime and tampered with evidence, and that parts of her testimony might not be believable. ("She said she did not know that Prystash was going to take the gun. I'm not sure I believe her. . . . Did she, in fact, tamper with bullets? Yes. Did she, in fact, lose the bullets? Yes. Did she, in fact, do that intentionally? Yes. . . . In that regard I don't have a whole great deal of respect for Mary Gipp.") The effect of the confessions was all the more substantial given that they were provided under the imprimatur of law enforcement.

## IV. CONCLUSION

For the foregoing reasons, the district court was correct in concluding that Fratta is entitled to habeas relief based on the Confrontation Clause violations that occurred at his trial. The judgment of the district court conditionally granting habeas relief on these claims is therefore AFFIRMED. We have also considered Fratta's request for a COA on his remaining claims under the appropriate standard; that request is DENIED.