IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,188






ROBERT ALAN FRATTA, Appellant



v.



THE STATE OF TEXAS








ON DIRECT APPEAL FROM CAUSE NO. 1195044


IN THE 230TH DISTRICT COURT


HARRIS COUNTY






 Johnson, J., delivered the opinion of the Court in which Keller, P.J., Meyers,
Price,Womack, Keasler, Hervey, and Alcala, JJ., joined. Cochran, J., did not
participate.


O P I N I O N



 Appellant was convicted in April 1996 of a capital murder committed in November 1994. 
Tex. Penal Code Ann. § 19.03(a)(3). Based on the jury's answers to the special issues set forth
in the Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge
sentenced appellant to death. Art. 37.071, § 2(g). (1) This Court affirmed appellant's conviction and
sentence on direct appeal. Fratta v. State, No. AP-72,437 (Tex. Crim. App. June 30, 1999) (not
designated for publication). Subsequently, this Court denied relief on his Article 11.071 application
for a writ of habeas corpus. Ex parte Fratta, No. WR-31,536-02 (Tex. Crim. App. Sept. 22, 2004)
(not designated for publication). Appellant then filed an application for a writ of habeas corpus in
federal district court, where relief was granted based on violations of the Confrontation Clause of
the Sixth Amendment to the Constitution of the United States. Fratta v. Quarterman, No. H-05-3392, 2007 U.S. Dist. LEXIS 72705 (S.D. Tex. Sept. 28, 2007) (not designated for publication). The
United States Court of Appeals for the Fifth Circuit affirmed the district court's judgment. Fratta
v. Quarterman, 536 F.3d 485, 488 (5th Cir. Tex. 2008).

 Following a new trial in May 2009, appellant was again convicted of capital murder. Based
on the jury's answers to the special issues, on June 1, 2009, the trial court again sentenced appellant
to death. Direct appeal to this Court is mandatory. Art. 37.071, § 2(h). After reviewing appellant's
thirty-two points of error, we find them to be without merit. (2) Consequently, we affirm the trial
court's judgment and sentence of death.

Statement of Facts

 Appellant does not challenge the sufficiency of the evidence of guilt. However, a brief
statement of the facts is helpful for an understanding of appellant's claims.

 After several months of searching for someone to murder his estranged wife, Farah Fratta,
appellant found Joseph Prystash, who obtained the assistance of a third person, Howard Guidry. On
November 9, 1994, the date of the murder, appellant took the couple's three children to Wednesday-evening church classes and attended a parents' meeting at the church. Although the children
regularly attended classes there, it was unusual for appellant to stay for the parents' meeting. 
Appellant repeatedly left the meeting to make and receive telephone calls in the church office. Farah
was shot and killed in her garage as she arrived home and stepped out of her car, shortly before
appellant was scheduled to return the children to her. She died approximately two years after she
filed for divorce and less than three weeks before the scheduled divorce and custody trial date.

 The state's theory concerning motive was that the prolonged divorce and child custody
proceedings formed the underlying basis for appellant's desire to have his wife killed. Several
witnesses testified that initially, appellant did not want the divorce. He complained that sex with
Farah was not exciting, but he thought that they could resolve their problems without a divorce if
Farah would agree to an "open marriage."

 A social worker who was assigned by the family court to evaluate appellant and Farah in
connection with the custody proceedings testified that she interviewed appellant in April 1993 and
Farah in March 1993. At that time, appellant did not want primary custody of the children, and
Farah was in favor of an extended visitation schedule for appellant. However, appellant and Farah
were at odds because appellant wanted to restrict Farah's ability to change residences with the
children to within a 100-mile radius, while Farah did not want a restriction on her ability to move,
and appellant wanted joint managing control over decisions about the children's lives, such as
medical and educational decisions, while Farah wanted sole control.

 As the divorce proceedings dragged on, appellant grew increasingly bitter and angry toward
Farah. He complained to friends that he was broke all the time because he had to pay child support,
and he said he wanted primary custody of the children so that Farah would have to pay him. At other
times, he said that he would not have to pay child support if he killed her. He complained that Farah
would "win" because her parents had money. He regularly called her "the bitch."

 During a deposition in December 1993, Farah explained why the divorce petition had been
filed on grounds of cruelty. Afterward, appellant told a friend that he was angry about the
accusations she made against him, which he said were false, and he did not want other people to hear
the things she had said. Appellant began actively seeking someone to kill Farah. He solicited many
of his friends and acquaintances to kill her or to recommend someone who could kill her. Initially,
most of his friends thought that he was joking or blowing off steam, but as he continued to talk about
it over time, some of them came to believe that he was serious.

 Prystash was not part of appellant's regular circle of friends, but on several occasions in the
weeks leading up to the offense, the two men were observed speaking privately together at a health
club where they were both members. Prystash's girlfriend, Mary Gipp, overheard Prystash
communicating with appellant by telephone. In addition, she often saw Prystash talking to her next-door neighbor, Guidry, on the balcony outside her apartment. On the evening that Farah was
murdered, Gipp came home from work to find Guidry, dressed in black, sitting on the steps in front
of her apartment. Prystash arrived a few minutes later but he soon left again. When he returned to
Gipp's apartment that night, Guidry was with him.

Confrontation Clause

 The details of the offense were developed primarily through Gipp's testimony describing her
observations and her conversations with Prystash, the testimony of some of Farah's neighbors who
observed parts of the offense and saw a suspect leaving the scene, witnesses who spoke with and
observed appellant around the time of the offense, and law-enforcement officers who investigated
the crime scene. Further evidence included telephone and pager records showing the times and
locations of communications between appellant, Farah, Prystash, and Guidry on the evening of the
offense and autopsy and ballistics reports.

 In points of error one through ten, appellant alleges that Gipp's testimony recounting
Prystash's statements to her was admitted in violation of the Confrontation Clause under Crawford
v. Washington. 541 U.S. 36 (2004). Specifically, appellant complains that the trial court erred by
ruling that the statements were non-testimonial. He asserts that the statements were not the sort of
spontaneous, casual statements that are properly determined to be non-testimonial. Appellant
complains of the following ten statements:

 (1) The murder was to happen on Wednesday night;

 (2) Prystash was the driver;

 (3) Prystash was the middle man who was to find someone to kill Farah;

 (4) Prystash was going to the President and First Lady health club;

 (5) Prystash was going to the President and First Lady health club to meet "Bob;"

 (6) They had killed Farah;

 (7) Prystash knew Farah was dead because he saw her body in her garage;

 (8) Prystash gave Guidry the murder weapon to dispose of;

 (9) Guidry threw the murder weapon into a body of water;

 (10) Prystash was to get a Jeep for his part in the offense.

 The Confrontation Clause provides that, in all criminal prosecutions, the accused shall enjoy
the right to be confronted with the witnesses against him. De La Paz v. State, 273 S.W.3d 671, 680
(Tex. Crim. App. 2008). Consistent with this guarantee, a testimonial hearsay statement may be
admitted in evidence against a defendant only where the declarant is unavailable, and only where the
defendant has had a prior opportunity to cross-examine. Id. Generally speaking, a hearsay statement
is "testimonial" when the surrounding circumstances objectively indicate that the primary purpose
of the interview or interrogation is to establish or prove past events potentially relevant to later
criminal prosecution. Id.

 Testimonial statements include those "made under circumstances which would lead an
objective witness reasonably to believe that the statement would be available for use at a later trial." 
Crawford, 541 U.S. at 52. Statements made to police officers during formal structured interrogations
are testimonial. Id. at 52-53, 68. Casual remarks to acquaintances generally are not. Id. at 51; see
also Woods v. State, 152 S.W.3d 105, 114 & n.34 (Tex. Crim. App. 2004). Although we defer to
the trial court's determination of historical facts and credibility, we review the constitutional ruling
of whether a statement is testimonial or non-testimonial de novo. Wall v. State, 184 S.W.3d 730, 742
& n.44 (Tex. Crim. App. 2006).

 The record establishes that these statements were non-testimonial. Prystash made the first
three statements to Gipp in conversations that took place before the offense. He made the fourth
through seventh statements in a conversation that took place in Gipp's apartment shortly after the
offense, while he was unloading and concealing the murder weapon. After that conversation,
Prystash left the apartment. Gipp retrieved two spent shell casings that Prystash had thrown into the
kitchen trash, and she wrote down the serial number of the murder weapon that he had hidden under
some clothes in the bedroom. She did not go to the police, and later she disposed of the shell casings
in a trash can at a shopping mall.

 The next two statements are arguably more problematic because Prystash made them to Gipp
after the police had come by her apartment. A reasonable person in those circumstances would be
mindful of an ongoing investigation and the possibility of a later prosecution. However, Gipp
testified that, as a result of that visit from police, she was worried about the presence of the murder
weapon in her apartment, and so she asked Prystash what he had done with it. Gipp was focused on
her own potential liability in the event that the police should find the weapon in her apartment, rather
than on collecting information for use in a later prosecution. Therefore, we hold that statements 8
and 9 were non-testimonial. See Davis v. Washington, 547 U.S. 813, 822-23 (2006); see also
Langham v. State, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010).

 The record does not reflect that statement 10 was made in response to any question, and its
prospective language described Prystash's expectations rather than a past event. See, e.g.,
Bullcoming v. New Mexico, 131 S.Ct. 2705, 2714 n.6 (June 23, 2011) (quoting Davis, 547 U.S. at
822) ("To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or
prov[ing] past events potentially relevant to later criminal prosecution'"). Therefore the trial court
did not err in finding that it was non-testimonial. Points of error one through ten are overruled.

Rule of Evidence 803(24)

 In points of error eleven through twenty, appellant alleges that the above ten statements were
admitted in violation of Rule 803(24) of the Texas Rules of Evidence. Specifically, appellant asserts
that statements 4, 5, and 9 were non-self-inculpatory, and that statements 2 and 3 were "blame-shifting." Appellant does not specifically challenge the self-inculpatory character of statements 1,
6, 7, 8, and 10, but he asserts that the Fifth Circuit has already determined that all ten statements did
not possess particularized guarantees of trustworthiness. See Fratta v. Quarterman, 536 F.3d 485
(5th Cir. 2008). However, the Fifth Circuit did not determine the admissibility of any of Prystash's
statements to Gipp as a matter of state evidentiary law. See id. at 502, 505-07. Rather, the Fifth
Circuit assessed whether Prystash's statements to Gipp violated the Confrontation Clause under Ohio
v. Roberts, 448 U.S. 56 (1980), which was the leading case when appellant's first conviction became
final. Fratta, 536 F.3d at 490. In 2004, the Supreme Court held that, when non-testimonial hearsay
is at issue, the states are afforded flexibility in their development of hearsay law. See Crawford, 541
U.S. at 68.

 Generally speaking, the hearsay rule excludes any out-of-court statement offered to prove the
truth of the matter asserted. Walter v. State, 267 S.W.3d 883, 889 (Tex. Crim. App. 2008). Rule
803(24), however, provides an exception for statements against interest. Id. at 890. The rationale
behind this exception is that people ordinarily do not make damaging statements about themselves
unless they believe that the statements are true. Id.

 The rule sets out a two-step protocol for the determination of admissibility. Id. First, the
trial court must determine whether the statement, considering all the circumstances, subjects the
declarant to criminal liability and whether the declarant realized this when he made the statement. 
Id. at 890-91. Second, the court must determine whether there are sufficient corroborating
circumstances that clearly support the trustworthiness of the statement. Dewberry v. State, 4 S.W.3d
735, 751 (Tex. Crim. App. 1999). A trial court should consider a number of factors: (1) whether
the guilt of the declarant is inconsistent with the guilt of the defendant; (2) whether the declarant was
so situated that he might have committed the crime; (3) the timing of the declaration; (4) the
spontaneity of the declaration; (5) the relationship between the declarant and the party to whom the
statement is made; and (6) the existence of independent corroborative facts. Id.

 Statements that are directly against the declarant's interest and collateral "blame-sharing"
statements may be admissible under Rule 803(24) if corroborating circumstances clearly indicate
their trustworthiness. Walter, 267 S.W.3d at 896. However, "blame-shifting" statements that
minimize the speaker's culpability are not admissible, absent extraordinary circumstances. Id. Thus,
the trial judge is obligated to parse a generally self-inculpatory narrative and weed out those specific
factual statements that are self-exculpatory or that shift blame to another. Id. at 897. The trial
court's ruling on the admissibility of a hearsay statement pursuant to an exception is reviewed under
an abuse of discretion standard. Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

A. Statements 4, 5, and 9

 Whether a statement is self-inculpatory can be determined only by viewing it in context. See
Williamson v. United States, 512 U.S. 594, 603 (1994). Viewed in context, Prystash's statements
4 and 5, that he was going to the health club to meet "Bob," are self-inculpatory and blame-sharing. 
Before the murder, Prystash told Gipp of his participation in the murder-for-hire scheme to kill
Farah. On the night of the murder, after telling Gipp that they had killed Farah and after hiding a gun
in Gipp's apartment, Prystash left. His statement as he was leaving, that he was going to the health
club to meet Bob, conveyed his continuing participation in the scheme that he had already described
to Gipp.

 Further, statements 4 and 5 were independently corroborated by testimony that after he left
Gipp's apartment, Prystash was seen at the President and First Lady health club where he and
appellant were members. He arrived within half an hour of closing time, dressed in street clothes
and without a gym bag. Prystash was reluctant to let the club manager scan his membership card. 
He said that he was looking for someone, and the manager informed him that the person he was
looking for was not there.

 Statement 9, that Guidry threw the murder weapon into a body of water, is not hearsay
because it was not offered for the truth of the matter asserted. Jurors were made aware that statement
9 was not true because other witnesses testified that the murder weapon was found in Guidry's
possession when he was arrested in March 1995 for an unrelated offense. Moreover, statement 9 did
not inculpate appellant. See Tex. R. App. P. 44.2(b); see also Walter, 267 S.W.3d at 900.

B. Statements 2 and 3

 In the context of the murder-for-hire scheme, the trial court did not abuse its discretion by
admitting statements 2 and 3, that Prystash was the driver and middleman, pursuant to Rule 803(24). 
It was within the zone of reasonable disagreement to characterize these statements as blame-sharing
rather than blame-shifting because they inculpated Prystash as a conspirator without shifting major
blame to another person. In fact, the prospective language of statement 3 inculpated Prystash as a
conspirator even before he had found anyone to help him carry out the offense.

 Further, statements 2 and 3 were independently corroborated by the following evidence: (1)
appellant and Guidry did not know each other but Prystash knew both men; (2) unusually frequent
communications between appellant and Prystash in the weeks leading up to the murder; (3) telephone
and pager records showing the times and locations of telephone calls between appellant and Prystash,
and Prystash and Guidry, on the evening of the murder; (4) a car with a broken headlight, similar to
Prystash's, was observed picking up the shooter from the scene of the offense; (5) Prystash replaced
a burned-out headlight on his car the day after the murder, and within a couple of weeks, he stopped
driving that car; and (6) a gun purchased by appellant was seen in Prystash's possession when he
removed two spent shells from it shortly after the murder and hid it under some clothes in Gipp's
apartment, and the same gun was later found in Guidry's possession.

C. Statements 1, 6, 7, 8, and 10

 In statements 1, 6, 7, 8, and 10, Prystash admitted to Gipp that the murder was to happen on
Wednesday, that they had killed Farah and that he knew she was dead because he saw her body in
her garage, that he gave the murder weapon to Guidry to dispose of, and that he would get a Jeep for
his part in the offense. These were blame-sharing statements that inculpated Prystash in the murder-for-hire scheme. They were independently corroborated by evidence that: (1) the murder happened
on Wednesday night; (2) Farah's body was found in her garage; (3) a gun purchased by appellant was
seen in Prystash's possession when he removed two spent shells from it and hid it shortly after the
murder, and the same gun was later found in Guidry's possession; (4) appellant owned a Jeep, which
he had offered to persons other than Prystash and Guidry as payment for murdering Farah; and (5)
shortly after the offense, Prystash was looking for someone at the health club where he and appellant
were members. Points of error eleven through twenty are overruled. Sexual Deviance

 In points of error twenty-one and twenty-two, appellant asserts that the admission at the guilt
phase of evidence of his sexually deviant preferences and behaviors was error because such evidence
was not relevant to his guilt and was more prejudicial than probative. See Tex. R. Evid. 401, 403. 
Specifically, appellant complains that the trial court allowed the state to present evidence that
appellant wanted to watch his wife engage in lesbian sexual activities, have her defecate in his
mouth, urinate on him, and choke him while he masturbated. He asserts that such "graphic
specifics" were unnecessary at the guilt phase, and therefore they were not relevant. He argues that
it was not necessary for the state to present evidence of sexual deviance to show his motive because
there was a plethora of evidence that appellant was angry about the divorce and his wife's stance
regarding custody of the children. Appellant argues that at the very least, the graphic and disgusting
language about his sexual perversions should have been excluded because it was unduly prejudicial. 
He complains that this evidence likely impressed the jury in some irrational but indelible way.

 As presented at trial, the lesbian-sexual-activities evidence was distinct from the other
sexual-preferences evidence, and so we will address the two types of evidence separately. Several
witnesses testified without objection that appellant wanted to have an "open marriage." Two
witnesses specifically testified about appellant's personal definition of an "open marriage." The first
witness testified that appellant's idea of an "open marriage" included watching his wife have sex
with other women. Appellant objected to this testimony on grounds of hearsay and relevance. See
Tex. R. App. P. 33.1. The second witness testified that appellant's idea of an "open marriage"
included having sex with his wife in combination with other women. Appellant objected to this
testimony only on grounds of attorney-client privilege and settlement-negotiation privilege. 
Therefore appellant failed to preserve his claims of relevance and undue prejudice with regard to the
latter testimony. See id. Because appellant did not object to the second witness's testimony on
grounds of relevance and undue prejudice, the admission of the first witness's testimony, even if
erroneous, would not result in reversal. See id.; see also Coble v. State, 330 S.W.3d 253, 282 & n.82
(Tex. Crim. App. 2010) (any error in the admission of evidence is cured where the same evidence
comes in elsewhere without objection).

 By contrast, the record shows that appellant was careful to preserve error concerning the
presentation of allegations from Farah's deposition about his other sexual preferences. Before trial,
the court granted the defendant's motion in limine, which extended to references by the state to
"deviate sexual preferences as inadmissible character evidence [and the] allegation that [appellant]
committed deviant sexual acts as described by the complainant on December 15, 1993." 

 At trial, the subject of the December 1993 deposition was first raised during the testimony
of James Beeler, Farah's first divorce lawyer. The jury was retired while the prosecutor proffered
that Beeler would testify that Farah had said in her deposition that appellant wanted her to defecate
in his face, urinate on his face, choke him while he masturbated, and hit him in the stomach while
he masturbated, and that he wanted her to perform such acts on a daily basis.

 Appellant objected that this testimony was hearsay, violated the Confrontation Clause, and
violated Rules 404, 403, and 401. (3) The prosecutor responded that this evidence was not offered for
the truth of the matter asserted but rather to show that the defendant, who was present during the
deposition, heard Farah's allegations and became angry. As such, this testimony was relevant to his
motive. The prosecutor represented that other witnesses would testify that appellant was angry when
he told them about the accusations Farah had made in the deposition, which he said were not true,
and that he did not want these accusations coming out in court.

 Defense counsel responded that under Crawford, Farah's deposition testimony was a
testimonial statement that implicated the Confrontation Clause, and motive was not an exception to
the hearsay rules. Counsel further argued that the allegations of specific acts were not relevant and
that they were not evidence of a motive for murder, just evidence that appellant was angry. 
Therefore, there was no need to go into the details of what Farah had said. The prosecutor answered
that admitting this evidence did not constitute a Confrontation Clause violation because appellant
had had Farah killed and therefore, he forfeited his confrontation right. The prosecutor reiterated
that this evidence was not offered to prove the truth of Farah's allegations, but instead to show that
appellant had heard Farah make them.

 The trial court ruled that Farah's allegations were not offered for the truth of the matter
asserted, and so they were not hearsay. They were relevant and admissible as evidence of motive,
and their probative value outweighed any prejudicial effect. The trial court granted appellant's
request for a limiting instruction to inform the jury that the allegations were offered for the purpose
of determining motive and not for their truth. This instruction was given when the evidence was
admitted. (4) A similar instruction was included in the jury charge. (5)

 Beeler's testimony before the jury was consistent with the prosecutor's proffer. Beeler also
stated that Farah was extremely emotional and distraught when she first gave him this information. 
He further testified that when Farah made these allegations during the deposition, appellant became
nervous and agitated. On cross-examination, Beeler acknowledged that parties to divorce
proceedings sometimes make outlandish accusations against one another. He further testified that
the divorce petition was initially prepared as a "no-fault" petition but that the petition was modified
to allege cruel treatment after an attempt at reconciliation failed and Farah disclosed this information
to him. Farah's deposition testimony would have been used before a jury if the divorce had
proceeded to trial.

 Rule 401 defines "relevant evidence" as any evidence having any tendency to make the
existence of a fact of consequence more or less probable than it would be without the evidence. Tex.
R. Evid. 401; see also Shuffield v. State, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). Except as
otherwise provided by statute or rule, a jury is entitled to have before it all possible relevant
information about the individual defendant whose fate it must determine. Sells v. State, 121 S.W.3d
748, 766 (Tex. Crim. App. 2003).

 Rule 403 provides that evidence, although relevant, may be excluded if its probative value
is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading
the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. 
Solomon v. State, 49 S.W.3d 356, 366 & n.26 (Tex. Crim. App. 2001). The balance between the
probative value and the countervailing factors set out in Rule 403 is always slanted toward the
admission of relevant evidence. De La Paz v. State, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). 
We generally consider the following factors in this analysis: (1) how probative is the evidence; (2)
the potential of the evidence to impress the jury in some irrational but indelible way; (3) the time
needed to develop the evidence; and (4) the proponent's need for the evidence. Solomon, 49 S.W.3d
at 366 & n.26.

 We review a trial judge's Rule 401 and 403 decisions for an abuse of discretion. Moreno v.
State, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993). We will reverse the trial judge's decision only
if it is outside the zone of reasonable disagreement. Salazar v. State, 38 S.W.3d 141, 150 (Tex.
Crim. App. 2001). Further, if the trial court's evidentiary ruling is correct under any applicable
theory of law, it will not be disturbed even if the trial court gave a wrong or insufficient reason for
the ruling. Sewell v. State, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982).

 Evidence that Farah accused appellant of extreme sexual deviance, in graphic and specific
terms, during a deposition that would be used in the divorce proceedings, was relevant and highly
probative because it made facts of consequence-appellant's motivation and intent to arrange Farah's
murder-more likely. See De La Paz, 279 S.W.3d at 349. Although the graphic specifics of Farah's
accusations could potentially affect the jury in an irrational way, the trial court minimized this risk
by instructing the jury that the accusations were to be considered only in determining appellant's
motive and not for their truth. We presume that the jury followed these instructions, and appellant
has not rebutted that presumption. See Colburn v. State, 966 S.W.2d 511, 520 (Tex. Crim. App.
1998). When questioning Beeler and making his closing argument, appellant suggested that Farah's
accusations were false or exaggerated, and the state did not challenge this suggestion. The state did
not devote a significant amount of time to the presentation of this evidence. The state sought to
show that appellant's desire to have Farah killed arose in part from his view of the divorce
proceedings as an embarrassment, and this evidence revealed the extent of the potential
embarrassment that appellant believed he faced. Farah's detailed accusations helped the jury
understand how appellant's anger and embarrassment could rise to the level of a motive for murder.

 Appellant now complains that Farah's deposition allegations were not relevant to his motive
because he did not hide these sexual preferences, and so he would not have killed her in order to
keep her from disclosing them. He points to two witnesses who testified during the punishment
phase that appellant had indicated to them that he liked to have women defecate in his face. 
However, notwithstanding these two instances of limited disclosure, the record demonstrates that
appellant did not widely share this information. Unlike his desire for an open marriage, appellant
did not disclose his other sexual preferences to Farah's attorney and the social worker connected with
the divorce proceedings. Farah's attorney testified that appellant seemed embarrassed and nervous
when Farah alleged during her deposition that appellant wanted her to engage in this behavior. One
of appellant's friends testified that appellant told him that he was angry about these allegations,
which he said were false, and he did not want Farah to repeat them in open court. 

 In light of the state's burden of proof and the matters placed in issue by the defense, the trial
court did not abuse its discretion when it determined that this evidence was admissible under Rules
401 and 403. Points of error twenty-one and twenty-two are overruled.

Conflict of Interest

 Points of error twenty-three through twenty-six are predicated upon appellant's allegation that
a conflict of interest arose between him and his second-chair counsel, Vivian King, during the
punishment phase. The events giving rise to the alleged conflict are described below.

 The jury returned a verdict of guilty on Friday, May 15, 2009. The trial court received the
verdict and announced a recess until Tuesday, May 26, 2009. Around that time, an investigator from
the district attorney's office requested that the sheriff's office monitor and record telephone calls that
appellant placed from the jail.

 On the evening of Thursday, May 21, the prosecutor telephoned appellant's first-chair
counsel, Randy McDonald, to notify him of her intent to introduce a recorded telephone conversation
dating from May 14 and some photographs that were seized from appellant's jail cell on May 21 as
a result of appellant's comments during that conversation. She told McDonald that appellant had
stated in the conversation that he had received some nude photographs of someone from King. 
Based on that conversation, deputies searched appellant's cell and seized the photographs he had
described, along with some other items identified as contraband. The prosecutor informed
McDonald that she intended to introduce the telephone conversation and the photographs into
evidence, but that she would redact appellant's reference to King. McDonald's investigator obtained
a CD copy of the recorded conversation from the district attorney's office on Friday afternoon but
was unable to play it. McDonald obtained a working copy of the recording and copies of the
photographs on the following Monday, May 25, which was Memorial Day.

 King first learned of the telephone conversation and photographs when she went to
McDonald's office around noon on Monday. At that time, she listened to the telephone conversation
and reviewed the photographs. King then scanned through her e-mails in an effort to identify
"Betsy," the person to whom appellant had been speaking. King discovered that, in the past, she had
received e-mails from someone named Betsy Gomez that were potentially useful as evidence. 
King's legal assistant would print them out at her office and place them in an envelope marked
"attorney-client privileged communication work product," which she would carry to the courtroom
and place on defense counsel's table. King and appellant would usually go over these materials
together during trial, but if they did not have time to review them in the courtroom, then appellant
might take an envelope of materials with him to review later. Based on this practice, King surmised
that an envelope containing these photographs had been left on counsel's table and that appellant had
carried it back to the jail.

 On Tuesday, May 26, the state presented its case-in-chief at punishment and rested. The
record for that day contains no mention of the telephone conversation and photographs. When the
court recessed for the day, the defense anticipated presenting its case-in-chief the following morning. 
However, on the morning of Wednesday, May 27, outside the presence of the jury, King requested
and received an opportunity to make a record concerning the telephone conversation and
photographs. She explained her practice of consulting with appellant about newly received materials
that were potentially useful as evidence. In support of King's explanation, the trial judge
acknowledged her prior discussions with King concerning the logistical difficulty of finding
opportunities for appellant's attorneys to consult with him during the trial about materials that might
be helpful in preparing his defense, and her awareness that King had been working around that
difficulty by having appellant review such materials while they were in court and while appellant was
in the holdover cell.

 The prosecutor indicated that the record should reflect that appellant took the envelope and
its contents back to the jail of his own accord and not on the instruction of his attorneys. She
reasoned that providing obscene material to an inmate could be a class C misdemeanor and so the
record needed to establish that appellant's attorneys did not provide it to him in jail: "so that no one
has to answer for any criminal liability down the line, . . . I think we also need to establish that he
did that all on his own." Appellant made a statement affirming that he alone was responsible for the
decision to carry the envelope containing the photographs back to the jail. He added that he did not
believe that the photographs were obscene or that he was committing an offense by possessing them. 
King also challenged the state's characterization of the photographs as obscene and indicated that
she was still not sure whether the photographs had any potential value as evidence for the defense.

 King then proposed to have her legal assistant, who was present, make a statement about
printing out the photographs at the office and carrying them to the courtroom in envelopes. The
prosecutor interjected, cautioning that King's legal assistant could be exposed to criminal liability
and so she should not make a statement to the court without legal representation. At that point, King
expressed that the threat of criminal liability was extremely intimidating and stressful, placed an
undue burden on her, and affected appellant's right to a fair trial. She complained that, after learning
of the telephone conversation on Monday, she had been unable to work on appellant's defense
because she was too distracted by trying to figure out what had happened with the photographs and
how best to defend herself. She requested a mistrial.

 The prosecutor explained that she had no intention of discussing how the photographs came
to be in appellant's possession or in pursuing an investigation against defense counsel, but that the
sheriff's office was also involved and so King's legal assistant should not make a statement in court,
where the bailiff was an agent of the sheriff, without knowing what she might be getting herself into. 
The trial court denied the motion for a mistrial and ruled that there would be no mention before the
jury of how appellant came into possession of the photographs. The trial court also made findings
that none of the attorneys had acted in bad faith or committed professional misconduct.

 Following that proceeding, the trial continued before the jury. The defense presented its
punishment-phase case-in-chief and rested. The state then presented its rebuttal. When the jury was
excused, the court and the parties anticipated that proceedings before the jury would resume at noon
the following day, May 28, with the state completing its rebuttal, and the parties beginning closing
arguments around 3:00 p.m.

 However, late in the morning of Thursday, May 28, 2009, the defense again requested a
mistrial, and the court conducted a hearing outside the presence of the jury. Defense counsel
presented a newspaper article that had run that morning with the headline, "Fratta Lawyer May Face
Inquiry." First-chair counsel McDonald stated that, given the article's representation that a
spokesman from the district attorney's office had indicated that King might be investigated for
providing contraband to appellant, this article created a conflict of interest between appellant and
counsel by placing King in the position of trying to defend her own actions and appellant's at the
same time. McDonald requested that the court poll the jurors about whether they had seen the
article. In addition, he requested a continuance. Initially, the trial court denied these requests. The
court reiterated that no reference to King as the source of the photographs would be allowed at trial.

 King then expressed that she was not ready to present a closing argument because she had
been distracted by having to defend herself on Monday and Wednesday; her office was in chaos
because her legal assistant was ready to quit after being threatened with criminal charges at the
Wednesday proceeding and seeing the newspaper article; King was upset because she had been
chastised by one of the prosecutors for her handling of the matter on Wednesday; the prospect of the
sheriff's office's involvement placed her in conflict with every bailiff in the courthouse; and
although she had intended to write her closing argument Thursday morning, she had spent all
morning fielding questions from attorneys and reporters about the newspaper article. King stated
that she could no longer effectively represent appellant and that she did not know what the
appropriate remedy should be. She requested a mistrial and a continuance. She indicated that if she
did not receive a continuance, the case would have to go forward without her:

 I have not been able to concentrate on anything but myself and my integrity,
where my focus should be on [appellant]. And it should not be on what's going to
happen to me now. . . . 

 So, I'm letting the Court know that I can no longer effectively represent
[appellant] at this time. I don't know what the right remedy is. I don't know if I
should be asking for a continuance. . . . my only interest here is to . . . diligently
represent my client. And I think that's been impeded.

* * *

 I don't know what the remedy is, but I'm asking for a mistrial at this time. 
And maybe a continuance. I think I have a right to a least prepare an argument for
him. At this point, I can't argue. And if we go forward, that's fine, but I will not be
able to participate in argument.


 At that time, although the trial court did not expressly grant any motions or requests on the
record, the court commenced an in-chambers poll of the jurors about whether they had seen the
newspaper article. McDonald represented appellant during the juror poll. Afterward, the court
announced that closing arguments would not begin that day. Instead, the presentation of evidence
would be completed and then the lawyers would be given "an opportunity to take a step back from
this issue, regroup, refocus, and move forth." The state then completed its rebuttal. The jury was
excused for the day, and the parties, with McDonald speaking for the defense, discussed the jury
charge. (6)

 On the morning of Friday, May 29, 2009, the parties informed the court that they were ready
for the jury. The court read the jury charge. After the state presented its initial closing argument,
King presented the first part of the defense's argument. Following arguments, the jury began
deliberating.

 On Saturday, May 30, 2009, while the jury was still deliberating, King entered exhibits in
support of a bill of exception. She submitted the marked envelope that contained the seized
photographs, and a print-out of an e-mail that was representative of e-mails that her legal assistant
had been carrying to the courtroom for her to review with appellant during the trial. Later that day,
the jury reached a verdict. The court reconvened on Monday, June 1, 2009, for sentencing. After
sentencing, King and McDonald addressed the court about obtaining an order to facilitate the return
of appellant's property to him in prison.

 In point of error twenty-three, appellant asserts that the trial court violated his right to the
effective assistance of counsel at the punishment phase by failing to obtain a waiver of conflict-free
representation after a conflict of interest arose between appellant and King. (7) In point of error twenty-four, appellant asserts that an unwaivable per se conflict of interest arose between appellant and King
that does not require a showing of prejudice.

 The principle that a criminal defendant is entitled to the assistance of counsel free from any
conflict of interest that conceivably could impair counsel's effectiveness is clearly and firmly
established in our law. Ex parte Prejean, 625 S.W.2d 731, 733 (Tex. Crim. App. 1981). On the
facts of this case, however, we find that appellant's right to the effective assistance of counsel was
not violated. Appellant does not allege a conflict of interest or ineffective assistance of counsel with
respect to his first-chair counsel, McDonald. See Ex parte McFarland, 163 S.W.3d 743, 760 (Tex.
Crim. App. 2005) (although his retained attorney slept through portions of the trial, applicant was
not deprived of the assistance of counsel under the Sixth Amendment because his court-appointed
second attorney was present and an active advocate at all times). There was no indication that
McDonald was unable or unwilling to prepare and present a defense if King could not go forward. 
Points of error twenty-three and twenty-four are overruled.

 In point of error twenty-five, appellant asserts that he was denied his constitutional right to
the effective assistance of counsel because an actual conflict of interest caused a lapse in
representation, namely, the preparation and presentation of closing argument at the punishment
phase. As discussed above, appellant has failed to show a violation of his right to the effective
assistance of counsel because he does not allege a conflict of interest with respect to McDonald. 
There was no indication that McDonald was unwilling or unable to prepare and present the defense's
closing argument if King could not go forward. Moreover, after King stated that she had not had an
opportunity to prepare her closing argument, the court gave her additional time. The following
morning, the defense announced ready, and King presented her closing argument. Point of error
twenty-five is overruled.

 In point of error twenty-six, appellant asserts that the trial court erred by failing to grant a
mistrial. A trial court's denial of a request for a mistrial is reviewed under the standard of abuse of
discretion. Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). A mistrial is used to halt trial
proceedings when error is so prejudicial that expenditure of further time and expense would be
wasteful and futile. Id. A mistrial is an extreme remedy that should be granted "only when residual
prejudice remains" after less drastic alternatives have been explored. Ocon v. State, 284 S.W.3d 880,
884-85 (Tex. Crim. App. 2009). When the party requesting a mistrial does not first request a lesser
remedy, we will not reverse the court's judgment if the problem could have been cured by a less
drastic alternative. Id. at 885; see also Wood v. State, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000).

 In this case, defense counsel first moved for a mistrial the day after the state rested its case-in-chief at the punishment phase. Defense counsel next moved for a mistrial and a continuance the
day after the defense rested its case-in-chief. Assuming arguendo that a conflict of interest had
arisen between appellant and King, a mistrial was not appropriate because appellant did not allege,
and the facts before the trial court did not reveal, a conflict of interest between appellant and
McDonald. Moreover, King's specific concern was that she had not had an opportunity to prepare
and present a closing argument. The trial court gave her additional time, after which the defense
announced ready, and King presented her closing argument. Point of error twenty-six is overruled.

Voir Dire

 In point of error twenty-seven, appellant claims that the trial court erroneously granted the
state's challenge for cause to prospective juror Ronald Wachtman, in violation of Wainwright v. Witt,
469 U.S. 412 (1985). Under Witt, the trial court may grant a challenge for cause to a prospective
juror based upon his views of the death penalty only if those views will prevent or substantially
impair the juror from following his oath and the applicable law. Segundo v. State, 270 S.W.3d 79,
93 (Tex. Crim. App. 2008). A juror need not shed his personal convictions regarding the death
penalty at the door to the jury room, but he must use the law, the evidence, and the trial court's
mandates as his ultimate guides in arriving at decisions as to guilt or innocence and as to
punishment. Granados v. State, 85 S.W.3d 217, 235 (Tex. Crim. App. 2002).

 A prospective juror who refuses to follow the statutory scheme and truthfully answer the
questions put by the trial judge may be properly challenged even if he might vote for death under
certain personal standards. Bell v. State, 724 S.W.2d 780, 794 (Tex. Crim. App. 1986). Factors
other than those prescribed by law must not be made absolute prerequisites for the imposition of any
punishment, including the death penalty. Fuller v. State, 829 S.W.2d 191, 200 (Tex. Crim. App.
1992). Any prospective juror who is unable to consider the maximum penalty allowed by law for
all legally eligible candidates is biased or prejudiced against the law and, therefore, subject to a
challenge for cause. Id.

 In assessing a prospective juror's capacity to obey his oath and follow the trial court's
instructions, we examine his testimony as a whole. Fearance v. State, 771 S.W.2d 486, 500 (Tex.
Crim. App. 1988). We review the trial court's ruling on the matter with considerable deference
because the trial court is in the best position to evaluate the venire member's demeanor and
responses. Davis v. State, 313 S.W.3d 317, 343-44 (Tex. Crim. App. 2010). When a prospective
juror's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial
court. Ladd, 3 S.W.3d at 559. We will reverse the trial court's ruling only if the record shows a
clear abuse of discretion. Gardner v. State, 306 S.W.3d 274, 296 (Tex. Crim. App. 2009).

 The record in this case reflects that the prosecutor began voir dire by asking Wachtman about
his affirmative response to a written question on the jury questionnaire: "Do you have any moral,
religious, or personal beliefs that would prevent you from returning a verdict which would result in
the execution of another human being?" Wachtman replied that he had been thinking a lot about the
death penalty, even before he was summoned to jury duty, because of recent cases coming to light
through the Innocence Project in which someone who had been found guilty was later proven
innocent. He was worried that an innocent man had probably been executed in Texas. Wachtman
also observed that many of the people on death row were very poor or indigent, which suggested that
the quality of an accused's defense at trial was in direct proportion to his wealth. Wachtman
indicated that the state's case would have to be very strong before he could find someone guilty and
sentence him to death, but he denied that he would hold the state to a burden of proof higher than
proof beyond a reasonable doubt. He acknowledged that no one can ever be 100 percent sure of
anything.

 Wachtman went on to say that he might have answered the written question in error because
after reading it again, he disagreed with his affirmative response. He stated that certain people and
certain crimes deserve the death penalty. On further questioning, Wachtman stated that he believed
anybody who intentionally took a life forfeited his right to live. He added that he "hoped" he could
believe that, explaining that he had believed it when he was younger but that he had mellowed as he
grew older. The prosecutor observed that Wachtman seemed to be struggling with the question of
whether he could serve on the jury and follow the law, and Wachtman replied, "Clearly, this is not
something I want to do."

 The prosecutor later asked Wachtman how his feelings about the death penalty would affect
his ability to answer the special issues:

[W]hat I'm concerned with is - you're fine in the realm of a life sentence, but I'm
concerned that you would never give serious consideration to answering those special
issues in a way where a death sentence was imposed. What do you think about that?


Wachtman replied, "I think I would answer those questions." He added that he thought he could
seriously contemplate answering the questions in a way that would result in the defendant being
executed. When the prosecutor asked him for examples of cases where he would consider the death
penalty to be appropriate, Wachtman stated, "I think if someone knowingly, with a full intent took
another person's life, they don't deserve to live." The prosecutor explained that Wachtman had just
defined murder rather than capital murder, and that capital murder required some aggravating
circumstance. Wachtman replied that based on that definition, he thought that some people who
committed "plain" murder deserved the death penalty.

 The prosecutor then directed Wachtman to a series of written responses he had given on the
questionnaire in which he expressed strong misgivings about the death penalty. She asked
Wachtman how he could reconcile his written statement on the questionnaire, that he was opposed
to capital punishment, with his statement on voir dire, that if someone took a life then he forfeited
his own life. Wachtman responded that some very young people who committed murder were not
old enough to know the consequences of what they did and so should not be put to death.

 Concerning his written questionnaire response that capital punishment was wrong but
necessary, Wachtman explained that putting someone to death is killing, and killing is wrong, but
"there is something in me that says when people do certain things they deserve to die." When the
prosecutor asked Wachtman about his questionnaire response in which he disagreed with the
statement, "Capital punishment is just and necessary," Wachtman stated that his written answer was
focused on whether capital punishment is just. He again expressed concern about cases in which
convictions had been overturned. He stated that in a perfect world, where only guilty people were
found guilty, capital punishment would be okay.

 Next, the prosecutor briefly reviewed the future-dangerousness and "anti-parties" special
issues. She then asked Wachtman more specifically about the mitigation special issue. When asked
if he would always answer the mitigation special issue affirmatively because he would be worried
about making a mistake, Wachtman first replied that he did not know, then said that he "very well
could," and then, "That's very possible." The prosecutor asked Wachtman if he would be so
concerned about the possibility of sending an innocent man to his death that he would always answer
the mitigation issue in a way that would result in a life sentence. Wachtman replied that he did not
think that he would do that, but he was not certain. He acknowledged that he was not sure if he
would be able to reconcile his personal belief and the law. At that point, the trial court warned the
prosecutor that her time was up. The prosecutor pressed Wachtman for a more definite answer:

Regardless of the facts, the circumstances, or the evidence, are you always going to
answer [the mitigation special issue] in a way that results in an individual getting a
life sentenced [sic] because of your beliefs and your convictions and because of the
reservations that you've already expressed?


Wachtman responded, "Probably so." When the prosecutor stated that he needed to say "yes" or
"no," Wachtman said that he would "have to lean yes." The prosecutor then asked:

If you are going to answer this question in a way that the answer, regardless of the
facts and evidence, is always going to be "yes," then that means you can't take this
oath because you will be promising to do something that you've already told us you
can't. Because of what we've talked about and your reservations and your personal
beliefs and because of what you just told me about the way you would answer [the
mitigation special issue], is it going to put you in a position where you're not going
to be capable of taking the oath to follow [the] law?


Wachtman replied, "Yes."

 The trial court then sought clarification, asking Wachtman again if he could follow the law
in answering the special issues:

[W]hen we first talked, I asked you if your personal, religious, or moral beliefs would
prevent you from serving on a jury where the death penalty is a possible punishment. 
As I understand the last answer you gave [the prosecutor], your answer to that
question now is yes, it would. Is that correct?

Wachtman confirmed that, after talking it through with the prosecutor, he believed that he would
answer the mitigation special issue in such a way that life rather than death would result because of
his reservations about the possibility of executing an innocent person. He added that if he found the
defendant guilty and then answered the first and second special issues affirmatively, he was not sure
whether he could render a verdict according to the law and the evidence on the mitigation special
issue.

 When defense counsel questioned him, Wachtman shifted his position, explaining that he
understood the standard of proof beyond a reasonable doubt and that he would apply it in
determining the defendant's guilt, but that he would require more certainty than that before he could
answer the mitigation special issue in a way that would result in a death sentence: "[U]nless I was
100 percent certain that person was guilty, I would probably give them the out there by [the
mitigation special issue]." He added, "[W]hen it comes down to the moment where you have to
decide life or death for someone, I may very likely just look and look and look for a mitigating
circumstance or something to get me off the hook and not have to sentence that person to death." 
He then stated more definitely, "[U]nless I was 100 percent certain that person did it, then I would
answer 'yes' [to the mitigation issue]."

 At the conclusion of voir dire, the prosecutor challenged Wachtman for cause, arguing,
among other things, that Wachtman had a bias against the law that he could not set aside. Defense
counsel objected to the challenge, arguing that Wachtman would apply the reasonable-doubt standard
at the guilt phase and that he was not challengeable for cause just because he would want more than
a reasonable doubt before he would answer the mitigation question negatively. The trial court
granted the challenge.

 On these facts, we conclude that the trial court did not abuse its discretion by granting the
challenge for cause. In response to the prosecutor's questions, Wachtman equivocated at first, but
eventually he stated that his personal beliefs placed him in a position where he was not capable of
taking the oath to follow the law. He affirmed that he would always answer the mitigation special
issue in such a way that a life sentence would result, regardless of the facts and evidence. As such,
he was challengeable for cause because his view of the death penalty would prevent or substantially
impair the performance of his duties as a juror. See, e.g., Segundo, 270 S.W.3d at 93; cf. Riley v.
State, 889 S.W.2d 290, 295 (Tex. Crim. App. 1994) (prospective juror who admitted that her feelings
against the death penalty would "affect" or "influence" her deliberation on the punishment issues,
but who also repeatedly stated that she would follow the law and answer the punishment issues based
on the evidence and the law, was not challengeable for cause).

 When defense counsel attempted to rehabilitate him, Wachtman stated several times that he
could not answer the mitigation special issue in such a way that the death penalty would be imposed
unless he was 100-percent certain of the defendant's guilt. One-hundred-percent certainty of guilt
is a factor not prescribed by law. See Gallo v. State, 239 S.W.3d 757, 779 (Tex. Crim. App. 2007)
("There is no constitutional right to have jurors' residual doubts about the defendant's guilt be
considered as a mitigating factor"); see also Abdul-Kabir v. Quarterman, 550 U.S. 233, 250-51
(2007). Wachtman made this factor an absolute prerequisite for the imposition of the death penalty. 
See Fuller, 829 S.W.2d at 200. The trial court did not abuse its discretion by determining that
Wachtman was challengeable for cause. Point of error twenty-seven is overruled.

Sufficiency of the Evidence-Future Dangerousness

 In points of error thirty and thirty-one, appellant challenges the legal and factual
sufficiency of the evidence to support the jury's finding of future dangerousness. He points out
that his only criminal conviction is the instant offense. He asserts that, in the fourteen years
between the first and second trials, his mental health was assessed by the Texas Department of
Criminal Justice ("TDCJ") every ninety days and he was never found to be at risk for hurting
himself or others. Until the enactment of TDCJ policies mandating that all male death-row
inmates are ineligible to work, appellant was a sewing-machine operator who worked in
proximity to sharp and dangerous objects in the garment factory. During that time, he never
threatened or harmed anyone or any property. His one disciplinary infraction was overturned on
appeal and was ordered removed from his disciplinary record.

 Appellant argues that the jury in the second punishment hearing relied on the same
psychological evaluations and facts of the case that were presented to the first jury, and the first
jury's future-dangerousness determination has been proven wrong by appellant's good behavior
in prison. He argues that the state offered no additional evidence in this trial from which a
rational jury could have found that there was a reasonable probability that appellant would be any
more of a danger to prison society for the next twenty-six years than he has been for the last
fourteen years. Appellant asserts that, given all the evidence, a rational jury would necessarily
entertain a reasonable doubt as to the probability that he would be a future danger. He argues
that the judgment should be reformed to reflect a life sentence.

A. Factual Sufficiency

 Appellant urges this Court to reconsider its refusal to conduct a factual-sufficiency review
of the future-dangerousness special issue because he has no criminal history except for the instant
offense and he "has been a model prisoner for fourteen years." This information is relevant to
our legal-sufficiency analysis, but it does not persuade us to reconsider our prior decisions
concerning factual-sufficiency review. See Williams v. State, 270 S.W.3d 112, 138 (Tex. Crim.
App. 2008); see also Martinez v. State, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Point of
error thirty-one is overruled.

B. Legal Sufficiency

 When reviewing the future-dangerousness special issue, we view the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact could have found
beyond a reasonable doubt that there is a probability that appellant would commit criminal acts
of violence constituting a continuing threat to society. Wardrip v. State, 56 S.W.3d 588, 593
(Tex. Crim. App. 2001). In determining the special issues, the jury is entitled to consider all of
the evidence presented at both the guilt and punishment stages of trial. Tex. Code Crim. Pro.
art. 37.071, § 2(d)(1); see also Young v. State, 283 S.W.3d 854, 863 (Tex. Crim. App. 2009). 
Some factors to be considered by a jury when answering the future-dangerousness issue under
Article 37.071, § 2(b) include: (1) the circumstances of the capital offense, including the
defendant's state of mind and whether he was working alone or with other parties; (2) the
calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the
crime's execution; (4) the existence of a prior criminal record, and the severity of the prior
crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether
the defendant was acting under duress or the domination of another at the time of the commission
of the offense; (7) psychiatric evidence; and (8) character evidence. Black v. State, 816 S.W.2d
350, 355 (Tex. Crim. App. 1991). The circumstances of an offense alone, if severe enough, can
be sufficient to sustain an affirmative finding as to a defendant's future dangerousness. Moreno
v. State, 721 S.W.2d 295, 302 (Tex. Crim. App. 1986). Using these factors, we hold the
evidence is sufficient to support the jury's affirmative answer to the future-dangerousness issue.

 Before the offense, appellant spent months soliciting numerous friends and acquaintances
to help him kill Farah. When friends warned him that he could get into trouble for speaking so
openly about killing his wife, he told them that it was part of his strategy to confuse the criminal
investigation that would follow. While soliciting one friend, appellant offered him a payment of
$1,000 cash "up front" and his Jeep, explaining that he would be able to make additional
payments after he gained control of the proceeds of Farah's life-insurance policy and an overseas
trust account containing the children's money. He later increased the offer to $5,000.

 Appellant conferred with Prystash over the course of several weeks leading up to the
offense. He planned the murder for a time when he knew that Farah would be waiting at home
for him to return their children according to the visitation schedule. He made sure that he would
be seen at church while the offense was being committed. During the offense, appellant
communicated with Prystash by telephone and by pager. Appellant timed his own movements so
that he and the children would come upon the crime scene shortly after the murder.

 In the days following Farah's murder, appellant showed no signs of sadness or regret to
police investigators or to his friends. One friend testified that appellant attempted,
unconvincingly, to act "down" for a day or two, but then his demeanor returned to normal. 
Another friend testified that the day after the murder, appellant stopped by his place of
employment to tell him that everything would be okay if everyone would just keep their mouths
shut. A few days later, appellant stopped by again to tell his friend to make a false confession
about shooting Farah if investigators questioned him.

 Former friends, as well as appellant's son, described appellant as a "good talker" who
could present a pleasant facade and persuade people to do things for him. Both the state's and
defense's psychological experts testified that appellant suffered from personality disorders. They
opined that appellant was narcissistic, paranoid, controlling, and lacked empathy. He had
difficulty accepting responsibility for his actions and blamed others for his problems. He liked to
think that he was dominating people, and he was the sort of person who enjoyed humiliating
those who depended on him. Appellant was also manipulative. He was able to maintain a calm
facade and appear to function normally, but he did not think normally. He was not able to
confront or make sense of difficult situations or to learn from his mistakes. He was "rigid" and
needed to feel that he was in control of his situation and his relationships with other people. He
was likely to react with vindictive anger when frustrated or embarrassed. Appellant was
masochistic sexually and had other atypical ideas about sexuality. The state's expert, Dr.
Lawrence Abrams, testified that appellant "saw girls as little, young, passive. Saw their sex
needs controlled, restricted. He thought he might have a need to dominate a little girl kind of
thing."

 While the experts' opinions were based largely on the results of psychological tests that
were conducted before the 1996 trial, 13 or more years before the trial at issue here, Dr. Abrams
testified that the character traits identified by a testing done by himself and four other
psychologists are ongoing and do not change much over time, and the defense psychiatric expert
agreed that character traits persist throughout adulthood. On the pre-1996 tests, appellant

showed a considerable degree of paranoia and psychopathy, meaning
psychopathic deviant behavior. They would correlate with suspiciousness, maybe
fixed beliefs, holding grudges, being rebellious, not conforming to convention,
maybe charming and pleasant, able to fool people, maybe even faking remorse,
but, essentially, someone who would lie and have no [conscience] about it.

 

 Dr. Abrams also testified about the inferences that may be drawn from a "scale four."

 The four is what they call a psychopathic deviancy scale. . . . If it gets high
enough, you['re] into lying, you get into antisocial behavior. And as a matter of
fact, a high score there would be diagnosed as an antisocial personality disorder at
this point in time, which would have to do with lying, cheating, maybe criminal
behavior, a variety of things, people [who] just don't get along in society.


Dr. Abrams testified that appellant's elevated score on the four scale would indicate antisocial
behavior of the sort demonstrated by persons with antisocial personality disorder. (8) Appellant
was also diagnosed as narcissistic--having a self-love so extreme that, if his desires were not
fulfilled, it led to intense anger. (9) Dr. Abrams noted that appellant had been tested by the Houston
Police Department and, subsequent to that testing, had twice been denied a place in a police-academy class.

 Based on all of the evidence presented at the guilt and punishment phases, a rational trier
of fact could have found beyond a reasonable doubt that there was a probability that appellant
would commit criminal acts of violence constituting a continuing threat to society. See Black,
816 S.W.2d at 355; Anderson v. State, 717 S.W.2d 622, 634 (Tex. Crim. App. 1986). 
Appellant's thirtieth point of error is overruled.

Admissibility of Punishment-phase Evidence

 In points of error twenty-eight and twenty-nine, appellant argues that the admission of
evidence of his sexual perversions or fantasies at the punishment phase was erroneous because
such evidence was not relevant to the special issues and was more prejudicial than probative. 
Tex. R. Evid. 401, 403. Specifically, he complains of the testimony of two acquaintances, Helen
Black-Pace and Jerry Parker. He also complains of the recordings of his telephone conversations
with Gomez.

A. Acquaintances' Testimony

 Black-Pace testified that she met appellant on a telephone chat line in 1989 or 1990. 
They chatted regularly, and after a few months their conversations became sexual. During these
conversations, appellant talked about things like tying up his wife or being tied up while the three
of them had sex together. Black-Pace acknowledged that she participated in these conversations
and "went along with" such fantasy talk. Eventually, Black-Pace and appellant met in person. 
On one occasion, appellant called her and said that he wanted to stop by her apartment one
morning, wake her up, and have her defecate and urinate on him and in his mouth. She told him
that she would not do that, and she let him know that she was disgusted by the suggestion. 
Appellant did not make that suggestion to her on any other occasion.

 Jerry Parker, appellant's former co-worker, testified that, while appellant's divorce was
pending, appellant would bring all types of women to the fire station where they worked. 
Appellant seemed to be domineering and controlling toward those women. For example,
appellant kept lifting up the back of one woman's dress, continually attempting to show off her
bottom to his co-workers, and the woman would simply say, "No, no," and pull her dress down. 
Appellant told another woman to expose her breasts, and she did. He sometimes talked to Parker
about his experiences in going to gay bars and about his sexual encounters involving multiple
partners. On one occasion, appellant told Parker that he liked to have women defecate on his
face. Parker could not tell if appellant was joking; he thought that it was funny at first, "but then
it was just gross." Defense counsel objected only to Parker's testimony about defecation. Thus,
appellant has not preserved any complaint with regard to the remainder of Parker's testimony. 
Tex. R. App. P. 33.1(a).

 Black-Pace's testimony that appellant was interested in tying up his wife or in being tied
up while the three of them had sex, and Parker's unobjected-to testimony about appellant's
encounters with multiple partners, were similar to guilt-phase testimony describing appellant's
idea of an "open marriage." See Tex. R. App. P. 33.1; Coble, 330 S.W.3d at 282 n.82. (10) Further,
Black-Pace's and Parker's defecation testimony was similar to the unobjected-to testimony of the
state's psychological expert, Dr. Lawrence Abrams. See id. Abrams had been assigned by the
family court to evaluate Farah, appellant, and their children and make a custody recommendation
as part of the divorce proceedings. Based on his interviews with Farah and appellant about the
masochistic sexual behaviors that Farah had described, he formed the opinion that they had a
"pretty sick relationship." Appellant was "into eating [Farah's] def[e]cation, swallowing her
urine," and "other aspects of masochistic sexual behavior," such as having her step on his face
and throat, and Farah went along with it for some time. Abrams testified that this was the most
extreme sexual deviancy that he had seen for any one couple.

 We are not persuaded that the trial court abused its discretion by admitting Black-Pace's
and Parker's testimony. Their testimony differed from Abrams's in one important respect: they
specifically identified appellant, alone, as the source of their information, whereas Abrams
generally referred to interviews with Farah and appellant. Thus, Black-Pace's and Parker's
testimony confirmed that Farah's allegations were true.

 Under the defense's theory, appellant killed Farah because he was afraid of losing his
children to a woman who had falsely accused him, under oath, of extreme sexual deviance in
order to gain an advantage in the custody proceedings. Under the state's theory, appellant had
disclosed this deviance to Farah and had pressured her to act on it, but he was willing to kill her
in order to prevent her from embarrassing him. As such, Black-Pace's and Parker's testimony
informed the jury of appellant's state of mind, character, and, ultimately, his future
dangerousness. See Davis v. State, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010); see also
Williams v. State, 273 S.W.3d 200, 220 (Tex. Crim. App. 2008).

B. Telephone Conversations

 Appellant also complains about the admission of his telephone conversations with
Gomez. (11) He identifies four statements that he made during these conversations, asserting that
they are unduly prejudicial and that they reveal "deviant sexual notions" that "are not accepted
norms in Harris County, Texas." He argues that their admission violated Texas Rules of
Evidence 401, 402, and 403 because they are highly offensive without being relevant to the
questions of whether appellant is likely to commit a criminal act of violence in the future and
whether there is a sufficient mitigating circumstance to warrant a life sentence.

 To the extent that appellant intends to single out particular statements in these
conversations for a separate analysis on appeal, he has waived error because he did not single out
any particular statements for objection at trial. See Roberts v. State, 220 S.W.3d 521, 532 (Tex.
Crim. App. 2007) (attack on victim impact testimony in general did not place the trial court on
notice that appellant would find particular testimony objectionable); Ladd, 3 S.W.3d at 572 (trial
court was not required, in the face of a global objection, to sift through an exhibit and segregate
the admissible portions from the inadmissible portions).

 The telephone conversations at issue were admitted during the state's rebuttal at the
punishment phase. Appellant had cross-examined Abrams about the possibility that the results of
psychological tests dating from 1984 and 1996 had become inaccurate by the time of the 2009
trial because a person could change over time, and Abrams acknowledged that possibility. 
Additionally, during the defense's case-in-chief, employees of TDCJ testified about appellant's
good disciplinary history and periodic mental-health evaluations that indicated that he was not a
danger to himself or others while in prison.

 The telephone conversations rebutted appellant's argument that he had changed from the
times of the psychological tests and the commission of the offense, such that he would not be a
future danger if he received a life sentence. See, e.g., Davis, 329 S.W.3d at 821 (it was within
the zone of reasonable disagreement that jokes Davis told his brother during a phone
conversation while incarcerated were indicative of his character, including his attitude toward
women, and thus relevant to determining his future dangerousness and to rebut his claims of
rehabilitation). In addition, these conversations demonstrated that, even while he was
incarcerated, appellant was able to befriend people outside of prison and persuade them to do
things for him. The trial court did not abuse its discretion by admitting this evidence at the
punishment phase. Points of error twenty-eight and twenty-nine are overruled.

Constitutionality of Sentencing Scheme

 In point of error thirty-two, appellant asserts that the capital-murder sentencing scheme is
unconstitutional because this Court does not conduct a meaningful appellate review of the special
issues that are determinative of the death penalty. He refers to this Court's refusal to conduct a
factual sufficiency analysis of the future-dangerousness question and to conduct any review of
the mitigation question. Appellant acknowledges that we have rejected similar claims. See, e.g.,
Conner v. State, 67 S.W.3d 192, 203 (Tex. Crim. App. 2001); Renteria v. State, 206 S.W.3d 689,
707 (Tex. Crim. App. 2006); Martinez, 327 S.W.3d at 730 (citing Brooks v. State, 323 S.W.3d
893, 912 (Tex. Crim. App. 2010)). Appellant's assertion that the Constitution requires
meaningful appellate review of the "'selective decision' of who dies" does not persuade us to
reconsider our prior decisions. Point of error thirty-two is overruled.

 We affirm the judgment of the trial court.


Delivered: October 5, 2011

Do Not Publish
1. Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.
2. Throughout these proceedings, appellant has filed pro se pleadings and letters in an attempt to
supplement his attorneys' efforts. Appellant is not entitled to hybrid representation. See Scheanette v. State, 144
S.W.3d 503, 505 n.2 (Tex. Crim. App. 2004). Thus, we do not address his pro se points.
3. On appeal, appellant does not complain that this testimony was hearsay or that its admission violated the
Confrontation Clause or Rule 404.
4. Immediately after the evidence was admitted, the court instructed the jury:


[T]he testimony of this witness on the last two questions was offered for the purposes of aiding
you, if it does aid you, in determining the motive, if any.

* * *

And it's not offered for the truth of the matter asserted.
5. After the parties rested and closed at the guilt phase, the court instructed the jury that 


if there is any evidence before you in this case regarding the defendant's having committed acts
other than those alleged against him in the indictment, to-wit: Extraneous sexual acts, you cannot
consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that
allegations of extraneous sexual acts were alleged, if any, and even then you may only consider the
same in determining the motive of the defendant, if any, in connection with the offense, if any,
alleged against him in the indictment and for no other purpose.
6. The record affirmatively demonstrates that McDonald rather than King represented appellant during the
juror poll. Although King's name does not appear in the record for the rest of the day, the record does not
affirmatively demonstrate that King was absent from the courtroom during that time. Either she was absent, or she
was present but not speaking, during the state's rebuttal and the discussion of the jury charge.
7. Appellant repeatedly describes this alleged conflict of interest as "State-created." Assuming without
deciding that the source of the alleged conflict might be relevant to our analysis, we observe that the threat of an
investigation and criminal liability as to King was a result of appellant's comments to "Betsy" in recorded collect
telephone calls he placed to her from jail, which asserted that King had given him Betsy's photographs, including an
"exposed one," and that he had masturbated while looking at them.
8. Antisocial personality disorder is defined by the DSM IV.A) There is a pervasive pattern of disregard for and violation of the rights of others occurring since
age 15 years, as indicated by three or more of the following:

1. failure to conform to social norms with respect to lawful behaviors as indicated by
repeatedly performing acts that are grounds for arrest; 

2. deception, as indicated by repeatedly lying, use of aliases, or conning others for personal
profit or pleasure; 

3. impulsiveness or failure to plan ahead; 

4. irritability and aggressiveness, as indicated by repeated physical fights or assaults; 

5. reckless disregard for safety of self or others; 

6. consistent irresponsibility, as indicated by repeated failure to sustain consistent work
behavior or honor financial obligations; 

7. lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated,
or stolen from another; 

B) The individual is at least age 18 years [at time of diagnosis]. 

C) There is evidence of conduct disorder with onset before age 15 years. 

D) The occurrence of antisocial behavior is not exclusively during the course of schizophrenia or a
manic episode.

 
9. Appellant's psychiatric expert also diagnosed narcissism.
10. To the extent that Black-Pace's testimony was arguably dissimilar because it mentioned appellant's
desire to tie up his wife or to be tied up during sex, its admission, even if erroneous, would have been harmless in
light of the other evidence of appellant's sexual deviance. See Tex. R. App. P. 44.2(b); see also Coble, 330 S.W.3d
at 286 n.89 (erroneous admission of particular future-dangerousness evidence was harmless in light of ample
additional future-dangerousness evidence).
11. While in jail during the 2009 trial, appellant made several collect telephone calls to Betsy Gomez. Parts
of their telephone conversations were played for the jury. In them, appellant frequently addressed Gomez as "Mrs.
Fratta," they told each other how much they loved each other and made plans to marry, and their conversations were
often sexually suggestive. Appellant joked that he had masturbated five times while looking at the photographs that
Gomez had sent him, and he asked her to send more. Appellant told Gomez that she was his "dream girl" and that
she would be his "trophy" when he got out of prison. They discussed ways that Gomez could modify a tattoo on her
bottom that included the name of a former boyfriend. Appellant requested pictures of the tattoo and of Gomez's bare
bottom, saying that prison regulations would allow him to have such pictures as long as they did not show her anus. 
Gomez said that she wanted to get a new tattoo for appellant. Appellant talked about starting his own political party,
and Gomez volunteered to look into ways to set up a web site to post appellant's writings and raise money.